E-filing     FILED

JUL 11 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD<br>OF KANSAS, INC. | ) )<br>) **CV  08      3356** |
| Plaintiff, | ) Civil Action No. _____ |
| | ) |
| v. | ) <u>JURY TRIAL DEMANDED</u> |
| | ) |
| | ) MDL # 1699 |
| PFIZER, INC., PHARMACIA CORPORATION, | ) |
| &, G.D. SEARLE LLC., | ) |
| Defendants. | ) |

**CRB**

## COMPLAINT

1.      Plaintiff Blue Cross and Blue Shield of Kansas, Inc., brings this action individually against Defendants, Pfizer, Inc. ("Pfizer"), Pharmacia Corporation ("Pharmacia"), and G.D. Searle & Co. ("Searle"), to recover damages, restitution, refunds, and/or for equitable relief arising from its payments made between on or about January 1, 1999, through April 7, 2005, with respect to the prescription drug Celebrex ("Celebrex"), an anti-inflammatory drug researched, manufactured, marketed, promoted, advertised, sold and distributed by a combination and/or collaboration of said Defendants.

## PARTIES

2.      Plaintiff, Blue Cross and Blue Shield of Kansas, Inc. ("BCBSKS") was and is a domestic health insurance corporation licensed to conduct business in the State of Kansas. At all times relevant herein, BCBSKS provided insured benefits, third party administrative services, and managed health care services for its insured and members. From on or about January 1, 1999, through April 7, 2005, BCBSKS paid for prescriptions of Celebrex that were filled by plan

members. At all times relevant herein, BCBSKS maintained its corporate headquarters at 1133 SW Topeka Boulevard, Topeka, KS 66629-0001.

3.    Defendant Pfizer is a Delaware corporation with its principal place of business in New York. In 2003, Pfizer acquired Pharmacia for nearly $60 billion. During the relevant time period, Pfizer has been engaged in the business of marketing and selling Celebrex nationwide. Defendant Pfizer may receive service of process through its Registered Agent: CT Services Corporation, 818 W. 7th Street, Los Angeles, CA 90017.

4.    Defendant Pharmacia is a Delaware corporation with its principal place of business in New Jersey. At all relevant times, Pharmacia has been engaged in the business of marketing and selling Celebrex nationwide. Defendant Pharmacia may receive service of process through its Registered Agent: CT Services Corporation, 818 W. 7th Street, Los Angeles, CA 90017

5.    Defendant Searle is a Delaware corporation with its principal place of business in Illinois. At all relevant times, Searle has been engaged in the business of marketing and selling Celebrex nationwide. Defendant Searle may receive service of process through its Registered Agent: CT Services Corporation, 818 W. 7th Street, Los Angeles, CA 90017.

## JURISDICTION

6.    There is complete diversity of citizenship between Plaintiff and Defendants. Additionally, the amount in controversy exceeds $75,000, excluding costs and interest. Therefore, this Court has jurisdiction of this matter under 28 U.S.C. 1332.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because defendants are subject to personal jurisdiction in this judicial district.

## SUMMARY OF ALLEGATIONS

2

8.    Non-steroidal anti-inflammatory drugs (NSAIDs") have been widely used to treat arthritis and pain for nearly forty (40) years. The pain relief offered by such NSAIDs comes at the expense of important adverse effects, most notably gastrointestinal toxicity. Use of NSAIDs leads to hospital admissions for ulcer complications (bleeding and perforation) in around one percent (1%) of users annually and results in thousands of deaths every year.

9.    In 1989, scientists made a breakthrough in understanding how NSAIDs worked. Cyclo-oxygenase, the enzyme inhibited by NSAIDs, exists in at least two forms in the body. Traditional NSAIDs inhibit both the cyclo-oxygenase 2 ("COX-2") enzyme, which is inducible and expressed at sites of inflammation, and the COX-1 enzyme, which is constitutive and expressed in areas including gastrointestinal ("GI") system. Inhibition of the COX-2 enzyme decreases inflammation and alleviates pain. One of the effects of inhibition of the COX-1 enzyme, however, is decreased protection in the GI tract. Defendants leapt at this new understanding, hoping to create a new breed of NSAID that alleviated pain, but did not have the GI toxicity associated with traditional NSAIDs. Defendants believed that this drug could be a blockbuster with yearly sales in the billions of dollars.

10.    Celebrex was Defendants' first attempt to develop a drug that lived up to this dream. Defendants' scientists were never able to establish, however, that Celebrex was any more efficacious or safe than traditional NSAIDs. To the contrary, studies showed risks for gastrointestinal and cardiovascular ("CV") adverse event rates similar to or greater than traditional NSAIDs. The FDA approved label warned of GI and CV risks similar to traditional NSAIDs. Even so, as part of the unlawful scheme set forth below, Defendants embarked on a massive marketing campaign directed to both doctors and consumers to market Celebrex as a "breakthrough" drug clinically superior to and safer than older and far less expensive NSAIDs.

3

11.     Defendants falsely represented that Celebrex provided symptomatic relief similar to ibuprofen and naproxen but was clinically superior because it had GI benefits and was the superior alternative for pain relief.  For instance, traditional NSAIDs can, in a limited group of patients, cause gastrointestinal perforations, ulcers and bleeding.  Defendants falsely promoted Celebrex as a safe and effective alternative that would have less deleterious and painful impacts on the gut than traditional NSAIDs.  These representations violated the scope of the FDA's approval for the marketing of Celebrex.

12.     Facing a rising tide of data that selective NSAIDs as a class posed cardiovascular risks, Defendants falsely claimed that Celebrex had cardiovascular benefits over alternative NSAIDs.  Defendants made representations that Celebrex, in order to distinguish it from other NSAIDs, had "Cardiovascular Benefits" and had an "Established Cardiovascular Safety Profile," even though its FDA approved labeling contained the precaution, "[a]s with other NSAIDs, CELEBREX should be used with caution in patients with fluid retention, hypertension, or heart failure," and listed multiple, observed cardiovascular adverse events.  After the withdrawal of Vioxx, another selective NSAID, Defendants, in an attempt to win over patients who had previously been on Vioxx, even attempted to convince doctors that Celebrex was cardioprotective.  These cardioprotective claims were not authorized by the FDA and violated the scope of the FDA's approval as to the marketing of Celebrex.

13.     Defendants made these claims despite the fact that the FDA, when it approved Celebrex, expressly warned that any advertising or promotional activity will be considered false and/or misleading if it suggests or represents any claims of safety beyond what was demonstrated in clinical trials and in the approved labeling.  The labeling did not allow for claims of GI

4

superiority or CV benefits, did not allow for cardioprotective claims and today contains black box warnings for both cardiovascular and gastrointestinal risk.

14.    The extent to which a drug is paid for by Third-Party Payors is determined by that drug's status on the Third-Party Payor's "formulary," which is a list of drugs that plan participants are authorized to purchase for payment under the benefit plan.   Placement of a prescription drug on the formularies of state Medicaid agencies Third-Party Payors, medical care organizations, and or prescription benefit managers (who are employed by the Third-Party Payors to design or administer the benefit plans) is critical to the success of the drug.  Defendants knew that preferred placement on these formularies would guarantee commercial success for Celebrex.

15.    In an elaborate and sophisticated manner, Defendants aggressively marketed Celebrex directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on Third-Party Payors, medical care organizations, large institutional buyers (*e.g.*, hospitals) and state Medicaid agencies to include Celebrex on their formularies.  Faced with the increased demand for the drug by consumers and health care professionals that resulted from Celebrex's successful advertising and marketing blitz, Third-Party Payors including state Medicaid agencies were compelled to add Celebrex to their formularies.  Celebrex's marketing campaign specifically targeted Third-Party Payors, physicians, consumers, and state Medicaid agencies, and was designed to convince all of these groups of both the therapeutic and economic value of Celebrex.

16.    Defendants' marketing and promotion of Celebrex was part of a scheme to falsely create the impression of, and demand for, Celebrex as a wide-ranging pain reliever that would enhance consumers' abilities to both live a normal life or engage in activities such as running,

5

playing a guitar, swimming, walking, taking exercise classes and a host of similar activities that many who suffer from chronic pain have difficulty performing and get relief from acute pain following surgery.

17.     The scheme was accomplished by unlawful means including, but not limited to: the false promotion of the CV safety or cardioprotective benefits of Celebrex; when in fact (a) the Celebrex label at all relevant times contained precautions regarding the potential for CV adverse events, (b) even though the warnings in the label grew stronger over time, culminating in a black box cardiovascular warning in July, 2005, the Defendants' promotion of Celebrex as cardiovascularly safe or protective actually became increasingly ardent, including the promotion of Celebrex as cardioprotective, when the Defendants had clear scientific signals of cardiovascular adverse event risk. The scheme also included manipulation of data in an effort to show a GI benefit. The scheme featured a claim that Celebrex "when used for 6 months. . .is associated with a lower incidence of combined clinical upper GI events than comparator NSAIDs (ibuprofen and diclofenac) used at standard therapeutic dosages" [JAMA.2000;284:1247-1255] when in fact: (a) the prespecified endpoint of the CLASS trial had been specifically defined as "Clinically Significant Upper Gastrointestinal Events" not the combination of symptomatic and serious complications reported as the endpoint in the JAMA report of the CLASS study;[1] (b) the study lasted twelve not six months; (c) even during the first six months of the study reported in JAMA patients taking Celebrex did not develop significantly fewer serious GI complications than those taking older NSAIDs; and (d) in fact, use of Celebrex for more than six months *increased* the risk of GI complications; (iii) the manipulation of data to

---

[1] "The definition of CSUGIEs [is that] chosen by the sponsor is. . . This is a clinically meaningful definition and represents a major advance in the study of UGI toxicity of NSAIDs." From Medical Officer's Gastroenterology Advisory Committee Briefing Document, Lawrence Goldkind, MD, http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b1 05 gi.doc

give the appearance of superiority over NSAIDs in pain efficacy and safety when such superiority did not exist; (iv) false promotional materials directed to doctors, third party payors and consumers concerning GI benefits and cardiovascular safety; and (v) the use of reprinted articles from prestigious medical journals that falsely claimed Celebrex was proven to be safer than NSAIDs.

18.    Recently a placebo-controlled trial of celecoxib has clearly demonstrated its cardiovascular risk (as did the Alzheimer's study that was completed in 1999, but not disclosed to the FDA in a timely fashion). This trial was the APC study, in which approximately 2,000 patients took celecoxib or a placebo. Interestingly, this was the longest celecoxib trial to date, with a mean duration of treatment of thirty-three months, as opposed to the much shorter twelve-month duration of the CLASS studies. A statistically significant elevation in the risk for a major fatal or non-fatal cardiovascular event (a composite endpoint of cardiovascular death, acute myocardial infarction, and stroke) was seen in those patients taking celecoxib compared to those in the placebo group. This followed a dose-response relationship:  the relative risk at 400 mg/day of celecoxib was 2.5 while the relative risk at 800 mg/day was 3.4. Because of this unacceptable danger, the trial was prematurely halted. The FDA released an explanatory statement which said, "While we have not seen all available data on Celebrex, these findings are similar to recent results from a study of Vioxx rofecoxib), another drug in the same class as Celebrex. Vioxx was recently voluntarily withdrawn by Merck."

19.    The Alzheimer's study, Defendants' protocol number IQ5-97-02-001, was completed June 24, 1999 and compared Celebrex to placebo for the slowing of the progression of Alzheimer's Disease and overall safety. In this study, patients taking Celebrex were 3.6 times more likely to experience a serious cardiovascular event (2.1% of patients taking placebo vs.

7

7.7% of patients taking Celebrex).[2]  Defendants' internal, final report of this study shows that the

increased risk of cardiovascular complications in patients taking Celebrex was statistically

significant.[3]  Furthermore, among patients taking Celebrex there were 12% more serious adverse

events (25.6% vs. 22.9%) and 59% more deaths (4.6% vs. 2.9%).  The study was never

published and was not presented to the FDA in time to be included in the February, 2001

Advisory Committee Meeting that considered the safety of Celebrex.  Had the findings from this

study been published and disclosed to the FDA in a timely manner, sales of Celebrex – based

primarily on the claimed safety advantage over older, less expensive NSAIDs – would have been

dramatically less.  These findings would have been material to prescribing doctors given the

concern, appropriately expressed in the JAMA article reporting the first six months of the

CLASS study, about the theoretical risk of increased adverse events disturbing the clotting

balance with selective COX-2 inhibition:

> Although it has been hypothesized that COX-2 specific inhibitors
> might increase the risk of cardiovascular thromboembolic events
> via inhibition of vascular prostacyclin synthesis without a
> corresponding inhibition of platelet thromboxane, no such increase
> was evident in the current study.

Defendants' promotion of the cardiovascular safety of Celebrex despite the results of this study

are particularly vexing, because it was completed eight months before the CLASS study was

completed, and its results should have informed the report published in JAMA.

> 20.     The Defendants' knowledge of CV risks was evidenced by a letter sent to the

FDA on January 31, 2005:

---

[2] Letter to FDA revealing heart dangers in an unpublished clinical trial of Celebrex (HRG Publication #1721),
Public Citizen, January 31, 2005.  http://citizen.org/publications/release.cfm?ID=7359.
[3] A statistically significant difference favoring placebo in adverse events was observed for certain CV-related body
system terms (Cardiovascular Disorders, General; Heart Rate and Rhythm Disorders; Myo, Endo, Pericardial &
Valve Disorders).  These differences were primarily driven by the individual terms cardiac failure, fibrillation atrial,
and angina pectoris.  http://www.clinicalstudyresults.org/documents/company-study_76_0.pdf.

January 31, 2005

Dr. Lester M. Crawford, Acting Commissioner
Food and Drug Administration
5600 Fishers Lane
Rockville, MD 20857

Dear Dr. Crawford,

Since filing our petition last week (January 24th) to immediately ban celecoxib (Celebrex) and valdecoxib (Celebrex) [1] *we have discovered the results of an unpublished randomized placebo-controlled study of Pfizer,* finished more than four years ago, that showed a significantly increased rate (3.5-fold) of serious cardiovascular adverse events and *more than a doubling in the rate of cardiovascular deaths in people using celecoxib compared to those using a placebo in a study concerning Alzheimer's disease.* (Emphasis added.)

* * *

The combined rate of all serious cardiovascular adverse events in patients getting a placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6-fold increase in cardiovascular risk in those people taking celecoxib. (p=0.03)

* * *

Thus, there was a statistically significant increase in the composite of all serious cardiovascular events in patients getting Celebrex compared to patients getting a placebo.

21.    Defendants falsely promoted Celebrex as safe, without reference to the risks present in the FDA approved label, because reference to such risks would decrease sales. Since its "Black Box" warning concerning cardiovascular risks issued in August 2005, which constitutes only a partial disclosure, Celebrex sales have dropped by 48%.

22.    On February 1, 2005, Pfizer finally admitted it was aware of a 1999 Alzheimer's clinical trial finding that elderly patients using Celebrex were far more likely to suffer heart problems than patients taking a placebo. The study was never published and was not submitted to the FDA until 2001, four months after the FDA's review of Celebrex and Vioxx. As stated by David Graham, M.D., MPH, of the FDA, in an editorial in the Journal of the American Medical

9

Association (JAMA) in September of 2006, "a Pfizer study of celecoxib in Alzheimer disease, which was completed in 2000 but not revealed until January 2005, showed an increase in cardiovascular risk with that drug. "*See* Graham, D., Cox-2 Inhibitors, Other NSAIDs, and Cardiovascular Risk: The Seduction of Common Sense, JAMA, E 1-4, September 12, 2006. Indeed, in weighing the cardiovascular and gastrointestinal risk-benefit of Celebrex, purchasers, if they had been fully informed of the risks, could have reached the same conclusion as Dr. Graham, who questioned if "COX-2 inhibitors cost substantially more, confer substantially greater cardiovascular risk, and offer no unique and meaningful gastrointestinal tract benefit over generic naproxen plus proton pump inhibitor, is there any point to the continued use of these drugs?" *Id.* at E2. The promotion of Celebrex as safer than Vioxx is a main reason why Celebrex has achieved greater commercial success than Vioxx.

23.    From 1999 through 2003, Defendants spent approximately $400 million on direct-to-consumer advertising for Celebrex. This expensive marketing effort paid off. Celebrex set an all time record for the shortest time from synthesis of the drug molecule to $1 billion in sales. In 2004, Celebrex achieved $3.3 billion in worldwide sales, 82% of which occurred in the United States[4]/[5] (the US and New Zealand – with a population of less than 4 million – are the only two industrialized countries that allow direct-to-consumer advertising). In 2004, Celebrex accounted for 6.3% of Pfizer's total worldwide sales of $52.5 billion.

24.    As a result of Defendants' scheme, they were able to create a market for Celebrex and to sell Celebrex at a premium price over traditional NSAIDs and to have it become a standard treatment option as opposed to use of less expensive NSAIDs. Also part of Defendants' scheme was their role in the publication of the American College of Rheumatology's guidelines for the treatment of osteoarthritis of the hip and knee issued in September, 2000. These guidelines called for the use of Celebrex or Vioxx if acetaminophen failed to provide adequate relief. Three out of the four authors had financial ties to the Defendants at the time these

---

[4] $2.7 billion in US sales in 2004: http://money.cnn.com/2006/01/17/news/companies/pfizer/.
[5] $3.3 billion in worldwide sales in 2004:
http://www.pfizer.com/pfizer/annualreport/2004/financial/financial2004.pdf

10

guidelines were written and such claims were not scientifically supported or approved by the FDA.

25.    The success of Defendants' scheme was recently documented in a study released on January 24, 2005, in the ARCHIVES OF INTERNAL MEDICINE, Volume 165, entitled *National Trends in Cyclooxygenage-2 Inhibitor Use Since Market Release.* The authors of that study concluded that the "aggressive marketing techniques to patients and physicians" caused a growth not only in use of COX-2 inhibitors but also in overall market demand.

26.    In fact, Celebrex has been promoted as a superior pain reliever when for most patients it has no proven superiority over other NSAIDs. Celebrex sells for $2.53 to $6.45 per day depending upon the dose, while NSAIDs sell for $0.21 to $0.31 per day. Billions of dollars have thus been wasted and Plaintiff has paid a premium price for a drug that is not a premium or superior product over equally available NSAIDs and other pain medications. If Defendants had not engaged in the wrongful marketing, advertising and promotion of Celebrex, Plaintiff would have paid for other equally effective and less expensive medications or made no purchase at all. Had the truth been told about its safety and efficacy, Celebrex would have sold at a price similar to that of far less expensive traditional NSAIDs and would not have become a standard in the treatment of arthritis and other forms of pain relief. The study in the ARCHIVES OF INTERNAL MEDICINE found that 63% of patients who received COX-2 inhibitors were at a low risk for developing the ulcers and GI problems that the COX-2 inhibitors were aimed at preventing *(i.e.,* they did not need Celebrex), and that Defendants' marketing scheme had played a significant role in over use of COX-2 inhibitors for this type of patient. In fact, the ARCHIVES study understates the lack of a need for Celebrex. A Federal Drug Administration ("FDA") reviewer found that Celebrex "did not appear to offer a unique advantage to high-risk patients." Thus in both the non-risk and at-risk population, Celebrex was neither more effective nor safer than other NSAIDs.

27.    In this action Plaintiff seeks damages arising from the purchases of Celebrex resulting from Defendants' illegal scheme and/or conduct.

11

28.    The Plaintiff purchased Celebrex based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

## FACTUAL BACKGROUND

### A.    Development of Celebrex

29.    Celebrex was the first prescription drug on the market in a new class of pain medications called "selective" NSAIDs.  Aspirin and ibuprofen are examples of well-known non-selective NSAIDs.

30.    NSAIDs reduce pain by blocking the body's production of pain transmission enzymes called cyclooxygenase or "COX." There are at least two forms of COX enzymes relevant to NSAIDs, COX-1 and COX-2.

31.    COX-1 is constitutively expressed in most tissues throughout the body, including the gastrointestinal tract, kidney and platelets.

32.    COX-2, is inducible, and is normally found in very low amounts in healthy tissue (except the brain and kidney), but is prominently expressed in inflamed tissues.  COX-2 is not expressed in the platelets or the gut.

33.    It is generally accepted in the medical community that blocking the COX-1 enzyme hampers the body's ability to repair gastric tissue and causes harmful gastrointestinal side-effects, including stomach ulceration and bleeding.  In addition, blocking the COX-1 enzyme decreases the production of thromboxane in platelets, diminishing thromboxane's effect of vasoconstriction and platelet aggregation, and thereby increasing the risk of abnormal bleeding.

34.    Traditional NSAIDs, like aspirin, reduce pain sensations by inhibiting both COX-1 and COX-2 enzymes simultaneously.  As would be expected, traditional NSAIDs increase the

risk of ulcers in the stomach and intestines. However, because of a complex chemical balance in the human body, traditional NSAIDs are not generally associated with blood clots, and aspirin even reduces the risk of clots and helps to protect heart function, an effect commonly referred to as "cardioprotection."

35.    Selective NSAIDs, unlike traditional NSAIDs, inhibit COX-2 to a greater degree than COX-1.    It is generally accepted in the medical community that blocking the COX-2 enzyme, without concurrent blocking of COX-1, encourages the formation of blood clots and increases the risk of various clot-related cardiovascular events, including: heart attack, stroke, unstable angina, cardiac clotting and hypertension.

36.    Defendants, in deciding to pursue the development of these selective NSAIDs, either intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostacyclin levels without a counterbalancing reduction in thromboxane production, thereby increasing the risk of blood clots and various clot-related cardiovascular and cardiorenal events.

37.    For decades, in the absence of other treatment options, consumers seeking pain relief were forced to accept and live with the gastrointestinal risks of traditional NSAIDs or take nothing and live with the pain.

38.    Defendants thought that by developing "selective" inhibitors that would block only COX-2 production, the proper maintenance of gastric tissue would remain while still reducing pain and inflammation.

**B.    Limited FDA Approval**

39.    Defendant Searle filed for FDA approval for Celebrex on June 29, 1998.  In its pre-approval marketing plans, Defendants planned that Celebrex would be approved and

13

that such approval would include an indication that it was safer than NSAIDs in protecting against GI complications.

40.    Pre-approval marketing plans stressed that Celebrex was superior to NSAIDs and thus a "breakthrough" in science and safety.    Pre-approval plans were to promote Celebrex as offering a significant reduction in GI complications.

41.    The FDA expressly criticized Celebrex's pre-launch marketing.    In a July 16, 1997 letter to Defendant Searle, the FDA warned that Searle was marketing celecoxib, an unapproved new drug, on its website www.searlehealth.com.  Specifically, the FDA criticized the Defendants' claims that,

> celecoxib "does not interfere with protective prostaglandins in the stomach, intestines and kidney."    Furthermore, the statement that celecoxib does not interfere with protective prostaglandins combined with the statement that commonly prescribed arthritis medications cause gastrointestinal bleeding, suggests that celecoxib does not cause gastrointestinal bleeding.

The FDA further criticized a press release that appeared on the same website that proclaimed that the results of a Phase II study support Celebrex's safety and efficacy, stating "Searle has not demonstrated that celecoxib does not interfere with prostaglandins in the stomach, intestines, or kidney nor that it does not cause gastrointestinal bleeding." Finally, the FDA blasted Defendants promotion of celecoxib as a "Breakthrough" in arthritis therapy stating that such statements are "clearly violative of the Act."  The FDA then recommended that Searle delete all references to celecoxib from its internet site.

42.    Again on December 8, 1998, the FDA sent a letter to Defendants finding additional violative pre-approval promotions of Celebrex. Namely, the FDA found the following statements in a November 12, 1998 press release, improper:

> "As Effective as Naproxen and Diclofenac but with a Gastrointestinal

14

Safety Profile Similar to Placebo."

"Searle and Pfizer's investigational drug, relieved the signs and symptoms of arthritis as effectively as the full therapeutic doses of two of the most widely prescribed non-steroidal anti-inflammatory (NSAID) pain relievers in use today, but with a gastrointestinal (GI) safety profile similar to placebo"

"Safety Profile Showed no Significant GI Safety Differences from Placebo"

"In Clinical studies, celecoxib was as effective as the widely used NSAID naproxen in both RA and OA, but with a superior safety profile"

Although the FDA recommended that all such promotions should cease immediately, Defendants carried on with such promotions of the false safety of Celebrex through launch, and as demonstrated in detail below, throughout the Class Period.

43.    These early preapproval marketing efforts were not approved in any fashion by the FDA, helped create demand for the, product, and included claims that the FDA, when Celebrex was approved, did not allow the manufacturer to make.

44.    In spite of early signals that selective NSAIDs posed CV risks, Defendants' initial marketing plan included the downplaying of any Celebrex CV risks and the promotion of Celebrex as cardiovascularly safer than traditional NSAIDs.  Defendants did so through several means, including (1) skewing studies so that CV adverse events were less likely to occur or would less likely be seen in the data produced; (2) delaying publication or release of data to the FDA or otherwise complete failure to disseminate negative CV scientific data that would contradict Defendants fraudulent, off-label CV marketing campaign; (3) actively promoting the CV safety of Celebrex; and (4) touting the general safety superiority of Celebrex in the midst of CV concerns over selective NSAIDs in order to give the impression that Celebrex had a superior CV profile to other NSAIDs.   After public concern began to grow regarding a potentially high

15

CV risk for all selective NSAIDs, Defendants continued to tout Celebrex as CV safe and even as cardioprotective in order to restore confidence in Celebrex and increase sales.

45.    The FDA approved Celebrex for the treatment of osteoarthritis and rheumatoid arthritis on December 23, 1999, warning "any advertising and/or promotional activity of this product will be considered false and/or misleading...if it presents suggestions or representations that COX-2 selectivity confers on the product any claims of safety beyond what has been demonstrated in clinical studies and presented in the approved labeling."

46.    Although Defendants had struggled for years to prove that Celebrex was safer on the GI tract, the FDA concluded that Celebrex had to retain the same GI warning in its label as traditional NSAIDs that serious gastrointestinal toxicity "can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs)." In approving Celebrex for the treatment of osteoarthritis and rheumatoid arthritis, the FDA specifically warned Defendants that any promotional activities "that make or imply comparative claims about the frequency of clinically serious GI events compared to NSAIDs or specific NSAIDs will be considered false and/or misleading...."    If the Defendants' marketing reflected their scientific knowledge of Celebrex or the FDA's conclusions regarding its safety and efficacy, this finding could have been a serious blow to their profits.

47.    The FDA, on January 29, 1999, with respect to G.D. Searle's initial promotional materials, warned Searle that any *suggestion* of GI superiority was misleading, "because it is based on nonclinical data and is not supported by evidence approved on the label." It continued that failure to include the GI warning in any promotional material "would constitute an omission of material fact."

48.    The original FDA approved label for Celebrex also included the precaution:

16

> *Fluid Retention and Edema*:
> Fluid retention and edema have been observed in some patients taking
> CELEBREX (see ADVERSE REACTIONS). Therefore, CELEBREX
> should be used with caution in patients with fluid retention, hypertension,
> or heart failure.

The Adverse Reactions section lists the following potential CV adverse events "aggravated hypertension,...syncope, congestive heart failure, ventricular fibrillation, pulmonary embolism, cerebrovascular accident, peripheral gangrene, [and] thrombophlebitis." The Defendants pre-launch and launch advertisements ignored these potential CV risks and instead promoted Celebrex as superior to alternative NSAIDs from a CV standpoint, a claim that is above and beyond and even contradicted by Celebrex's FDA approved label.

**C.    The CLASS Study**

49.    Defendants funded significant clinical trials hoping to demonstrate that Celebrex had greater gastrointestinal safety than traditional NSAIDs: the Celecoxib Long-Term Arthritis Safety Studies ("CLASS").

50.    Defendants expected the CLASS study to show that Celebrex was statistically significant in reducing serious GI complication over NSAIDs and that the results would allow removal of the warning label. Removal of the warning label would in turn justify Defendants' GI superiority marketing campaign.

51.    The CLASS trials were long-term, double-blind studies of gastrointestinal toxicity in 8,059 patients taking Celebrex, ibuprofen or diclofenac to treat arthritis.  Patients with heart problems were allowed to participate in the CLASS trials, and were permitted to take low doses of aspirin to reduce the risk that they would suffer an adverse CV event during the study.

52.    When the CLASS study was completed, the results were reported to the FDA's Arthritis Drugs Advisory Committee ("the Committee") as part of a request to exempt Celebrex

17

from including the standard NSAID GI safety warning in its package insert. The Defendants attempted to frame the data so that it appeared that Celebrex was safer on the GI tract. The Defendants also hoped that the FDA did not notice the CV safety signals in the data as evidenced by a July 2001 "War Room" meeting at which the Defendants discussed preparations for the "worse case scenario (i.e. CV in the label)."

53.    After reviewing the CLASS results, ***the Committee concluded that patients taking Celebrex had not experienced fewer gastrointestinal complications than those taking traditional NSAIDs***. In other words, CLASS showed that Celebrex failed to achieve its primary endpoint of reduced "clinically significant serious gastrointestinal events." Without evidence of enhanced safety, the Committee then recommended that the Celebrex label contain the same GI warnings as traditional NSAIDs, and advised further studies to assess the risk of COX-2 inhibitors when taken with aspirin. Thus, Defendants' clinical studies did not have their intended effect: Celebrex was not permitted to claim increased GI safety over traditional NSAIDs.

54.    The CV precaution in Celebrex's labeling was expanded to,

> Fluid Retention, Edema, and Hypertension: Fluid retention and edema have been observed in some patients taking CELEBREX (see ADVERSE REACTIONS). In the CLASS study...the Kaplan-Meier cumulative rates at 9 months of peripheral edema in patients on CELEBREX 400 mg BID (4-fold and 2-fold the recommended OA and RA doses, respectively, and the approved dose for FAP), ibuprofen 800 mg TID and diclofenac 75 mg BID were 4.5%, 6.9% and 4.7%, respectively. The rates of hypertension in CELEBREX, ibuprofen and diclofenac treated patients were 2.4%, 4.2% and 2.5%, respectively. As with other NSAIDs, CELEBREX should be used with caution in patients with fluid retention, hypertension, or heart failure.

A warning was added to the Drug Interactions section, stating,

> Because of its lack of platelet effects, CELEBREX is not a substitute for aspirin for cardiovascular prophylaxis.

18

The FDA also insisted that the following data regarding the withdrawals for serious adverse events be included on the Celebrex label:

> Kaplan-Meier cumulative rates at 9 months for withdrawals due to adverse events for CELEBREX, diclofenac and ibuprofen were 24%, 29%, and 26%, respectively. Rates for serious adverse events (i.e. those causing hospitalization or felt to be life threatening or otherwise medically significant ) regardless of causality were not different across treatment groups, respectively, 8%, 7%, and 8%.

> Based on Kaplan-Meier cumulative rates for investigator-reported serious cardiovascular thromboembolic adverse events*, there were no differences between the CELEBREX, diclofenac or ibuprofen treatment groups. The rates in all patients at 9 months for CELEBREX, diclofenac and ibuprofen were 1.2%, 1.4%, and 1.1% respectively. The rates for non-ASA users in each of the three treatment groups were less than 1%. The rates for myocardial infarction in each of the three non-ASA treatment groups were less than 0.2%.

> * includes myocardial infarction, pulmonary embolism, deep venous thrombosis, unstable angina, transient ischemic attacks or ischemic cerebrovascular accidents.

These precautions were meant to further alert to doctors and patients the possible CV risks associated with Celebrex. The CLASS data, as interpreted by the FDA (and even with aspirin use that could mask any CV safety signals), revealed that Celebrex had similar, if not greater, CV risk to patients than traditional NSAIDs.

55.    Defendants, prior to the CLASS findings, had initiated extensive pre-release marketing campaigns to convey the uniform message that Celebrex provided effective relief of arthritis pain without the potential GI side-effects and CV risks of traditional NSAIDs.

**D.    The JAMA Publication of CLASS**

56.    The Defendants, irrespective of the conclusions reached by the FDA, manipulated the results of CLASS to make it appear to the medical community and the public at large that the trials had shown that Celebrex was safer than traditional NSAIDs on the GI tract. For instance,

manipulated results of the CLASS study were published in the September 13, 2000 issue of JAMA.

57.    Each of the Defendants played a role in the establishment of the CLASS trials and how the results were then portrayed to JAMA and to the medical community.

58.    *The article in JAMA concluded that Celebrex, "when used for 6 months ... is associated with a lower incidence of clinical upper GI events than comparator NSAIDs (ibuprofen and diclofenac)."* The accompanying editorial supported this conclusion: "The results of this important study ... provide *promising data* to suggest that [Celebrex  is] ... *effective in reducing*, but not eliminating the risk of symptomatic [minor] ulcers and [major] ulcer complications in the enormous number of individuals who might benefit from these drugs...."

59.    There was, however, one very large problem.    The manufacturer's original research plan, as submitted to the FDA, had defined the duration of the CLASS study that compared Celebrex with ibuprofen as 12 months, and that of the study comparing Celebrex with diclofenac as 16 months.    And, indeed, the combined study had run for a full 12 months.    *The authors, however, submitted only the first six months of data for the article in JAMA.*    Peer reviewers, editors, and editorialists had no way of knowing that the study had last for 12, not six, months. As a result, data from the *second* six months of the study were unreported and invisible to even the most careful readers of the JAMA article. The missing data invalidated the conclusions presented in the JAMA article:    *six of the seven serious gastrointestinal complications that occurred in the second half of the study were in patients taking Celebrex.*

60.    Pharmacia had presented a statistical argument to the FDA justifying its omission of the data from the second half of its study. The company claimed that since a higher percentage

20

of people taking diclofenac dropped out of the study because of minor symptoms like heartburn, the data from the second half of the study were invalid because of what is called "informed censoring." Pharmacia argued that these dropouts would have gone on to develop serious GI complications, and their dropping out of the study artificially minimized the risk of serious complications in the people taking diclofenac. The FDA flatly rejected this argument.    It countered that there was no proof that the people with heartburn would have developed more serious GI problems. Further, the FDA GI reviewer concluded that if minor symptoms caused people in the study to stop taking diclofenac, people in the real world would similarly stop taking the drug if it caused heartburn and would similarly protect themselves from going on to develop serious GI complications.

61.    The FDA's opinion of the manufacturer's decision to publish only half of the data from its study was clear: "[T]he sponsor's presentations of 6-month data ... are not statistically valid or supportable." The FDA's gastroenterology reviewer concluded that the first six months of data — which had been presented in the JAMA article as if they were a report of the entire study — were not worthy of separate consideration: "Based on the lack of adequate rationale, these post-hoc analyses will not be further discussed or presented in this review."    Looking at the data from the entire year of the study, the FDA's gastroenterology reviewer concluded that ***"the sponsor has failed to demonstrate a statistically significant lower rate"*** *of serious GI complications in the people who took Celebrex compared with the people who took the other NSAIDs*.    When the reviewer looked at only the second six months of data (*i.e.*, the data that had not been published in the JAMA article), he ***concluded that the risk of serious GI complications appeared to be higher in the people who took Celebrex "compared to both ibuprofen and diclofenac"*** (emphasis in original).    This was hardly an endorsement for a drug

21

whose only advantage (besides the convenience of a once-daily dosing) was that it supposedly caused fewer serious GI problems.

62.    The disparity between the Defendants public marketing of Celebrex and the information in the FDA's files by no means stopped there. The primary question that the CLASS study had been designed to answer had been changed, producing results that were far more favorable to the manufacturer. The original research design submitted to the FDA by the manufacturer of Celebrex had stated:  "The primary objective of this study is to compare the incidence of *clinically significant* [major] upper gastrointestinal events ... in patients taking Celebrex to patients taking NSAIDs." The term *"clinically significant"* refers to complications that would generally require hospitalization: active bleeding, perforation of the stomach or duodenum requiring surgery, or obstruction of the outlet of the stomach. The research plan specifically called for the less serious gastrointestinal side effects to "be categorized and analyzed separately."  Indeed the FDA's gastroenterology reviewer specifically commented that the plan to identify the "truly significant" serious gastrointestinal complications alone was a "major strength of the current study."

63.    But when the results of the study were published in JAMA, the incidences of major and minor gastrointestinal complications were combined. Why the change? The results of the study as originally designed failed to show that the people who took Celebrex developed significantly fewer major GI complications than the people who took ibuprofen or diclofenac, even for just the first six months.  *Only by combining the minor GI symptoms with the more serious gastrointestinal complications could the article conclude that Celebrex caused a statistically significant decrease in gastrointestinal complications compared with the other NSAIDs.*  As noted above, when the FDA looked at the results of the CLASS study in terms of

22

the research question that had *originally* been posed, Celebrex was not significantly safer than the other NSAIDs.

64.    Finally, the most important measure of safety is the overall frequency of serious side effects — including, but not limited to, GI side effects. For the full 12 months of the study, *the people in the CLASS study who took Celebrex experienced 11 percent more serious complications* (in all body systems combined) than the people who took the older and less expensive anti-inflammatory drugs. This difference did not reach statistical significance but certainly is significant in countering Pharmacia's claim that Celebrex is better than older NSAIDs because it is safer.

65.    These findings contributed to the FDA's decision to send one of its rare "Warning Letters" to the CEO of Pharmacia in February 2001. The letter cites repeated unsubstantiated marketing claims that Celebrex is the preferred NSAID for people taking a blood thinner and that it is safe and effective for the treatment of acute pain — a use for which it was not approved — and points out that Pharmacia's marketing material fails to warn of the possibility of serious GI complications caused by the drug. The Warning Letter concludes by saying:

> Your promotional activities described above raise significant health and safety concerns in that they minimize crucial risk information and promote Celebrex for unapproved new uses. In two previous untitled letters dated October 6, 1999, and April 6, 2000, we objected to your dissemination of promotional materials for Celebrex that ... contained unsubstantiated comparative claims, and lacked fair balance. Based upon your written assurances that this violative promotion of Celebrex had been stopped, we considered these matters closed. Despite our prior written notification, and notwithstanding your assurances, Pharmacia has continued to engage in false or misleading promotion of Celebrex.

66.    Also included in the Warning Letter was the requirement that Pharmacia send out the "Dear Healthcare Provider" letter. Of course, the letter sent out by the manufacturer was not quite as specific as the FDA's Warning Letter. Few doctors, even if they had bothered to wade

23

through the difficult language, had the time or inclination to find out the story behind the letter. As a result, *doctors continue to this day to prescribe Celebrex for their patients based on the "scientific evidence" published in JAMA,* not understanding that it was incomplete and presented an inaccurate picture of the so-called safety advantage of Celebrex over other less expensive NSAIDs.

**E.    Use of the CLASS Study to Promote Sales of Celebrex**

67.    The JAMA article falsely concluded that Celebrex was associated with a lower incidence of complications than NSAIDs.

68.    *The flawed conclusions of CLASS, which were disputed by the FDA, were widely distributed and believed by physicians.*    Tens of thousands of reprints of CLASS were bought from the publisher and a recent search of the Science Citation Index yielded 169 articles citing it, more than 10 times as many citations as any other article published in the same issue. The reprints were used by the Celebrex sales team to convince doctors that the "scientific evidence" showed that Celebrex was safer for their patients than older, less expensive NSAIDs. The wide distribution of the JAMA article purporting to present the results of the CLASS study increased sales of Celebrex.

69.    According to the BRITISH MEDICAL JOURNAL, Volume 324, June 1, 2002, many physicians still believe the CLASS study:

> Publishing and distributing overoptimistic short term data using post hoc changes to the protocol, while omitting disappointing long term data of two trials, which involved large numbers of volunteers, is misleading. While some of the problems related to CLASS were partially covered in the news sections of BMJ and other journals, it was not emphasized how flawed the trial actually was, and how inadequate the authors' justifications. Consequently, CLASS may still be relied on by many physicians without reference to these flaws. In our experience most still believe the findings published originally. For example, most of 58 physicians attending an osteoarthritis workshop in Berne, Switzerland, in

December 2001 had not realized that CLASS was seriously biased.

70.     The JAMA article was critical to the launch of Celebrex. Once a drug is introduced into the market and establishes itself at a certain price point, unless there is a withdrawal of the drug, the price point remains. By use of the incomplete study information published in JAMA, as well as other misleading statements, Defendants were able to establish the price of Celebrex.

**F.     Misleading Articles in Medical Journal Used to Establish Celebrex in the Marketplace**

71.     Defendants also used the placement of misleading articles in prestigious journals as a means to falsely promote Celebrex. Defendants placed articles, through paid consultants, in prestigious journals including JAMA, ARCHIVES OF INTERNAL MEDICINE and other publications.

72.     An example is a "Special Article" appearing in ARTHRITIS & RHEUMATISM, Vol. 43, No. 9, September 2000, entitled *Recommendations for the Medical Management of Osteoarthritis of the Hip and Knees*. These guidelines, endorsed by the American College of Rheumatology (the professional society of arthritis specialists, became the gold standard for treatment of osteoarthritis ("OA"). Three out of four of the expert authors had financial relationships with Searle and Pharmacia. These guidelines state if non-pharmacologic therapies (like heat, ice, and physical therapy) fail to provide adequate relief from osteoarthritis pain, drug treatment should be initiated with acetaminophen (Tylenol). If acetaminophen provides inadequate relief, the next drugs recommended were COX-2 specific inhibitors, not other traditional NSAIDs. Without regard for the proscription included in the FDA's new drug approval letter to Searle about Celebrex, the guidelines assert that COX-2 inhibitors, based on

endoscopic studies, have an advantageous safety profile. The FDA's letter of December 31,

1998 addressing this issue stated:

"... any promotional use of endoscopic data without the qualifying explanations of
that data found in the approved labeling ... will be considered false and misleading."
[Label: The correlation between findings of endoscopic studies, and the relative
incidence of clinically serious upper GI events that may be observed with different
products, has not been fully established.]

*Nonetheless, the authors of these guidelines concluded that COX-2 inhibitors, based on*

*endoscopic studies, have an advantageous safety profile. Referring to the CLASS study,*

*the authors noted that data from this study had not yet been published.*

73.    Medical journals that publish articles can add substantially to their income

selling reprints to drug companies. Drug companies in turn give these reprints to their sales

force who provide these to doctors as proof of a drug's superiority or qualities.

74.    The publication of these guidelines established the use of COX-2 inhibitors as

the standard drug therapy for the treatment of OA.  Defendants purchased reprints of this

article and it was used to promote the use of Celebrex for OA patients.  As a result of such

use, Celebrex became the standard course of treatment in such patients.

75.    At the time these guidelines were written, the results of the CLASS study had

not yet been published (the two articles were published almost simultaneously in September

of 2000), but Defendants were aware of the results of the CLASS study.  When the results of

the CLASS study were published in JAMA, showing that Celebrex does not significantly

reduce the risk of serious GI complications in comparison to other NSAIDs, Defendants did

not seek to correct the guidelines, and continued to distribute reprints despite the fact that the

guidelines did not reflect the best available scientific evidence.  The authors, being paid by

26

the pharmaceutical industry, did not print a correction and these guidelines continued to be used by physicians as the prescribing standard.

76.    The guidelines *may* have been formulated on the best evidence that had been published at the time they were issued in the September 2000 issue of ARTHRITIS & RHEUMATISM.  But the CLASS study had been completed by March 2000 — and certainly this information ***should have been included*** in the guidelines that were issued in September 2000 and remained in effect through the time that Vioxx was taken off the market.  These guidelines were available continuously on the government sponsored guidelines website, www.guideline.gov, during that time.  There was no revision of the posted guidelines when the results of the CLASS studies were (such as they were) published in JAMA the same month, September 2000.  The CLASS studies showed that among the subset of patients taking aspirin, those treated with Celebrex experienced no fewer GI complications than those treated with older, less expensive NSAIDs — even for the first six months of the study that were published.   Nor were the guidelines updated when the FDA "Warning Letter" dispelled the claim that Celebrex is safer than other NSAIDs in patients on anticoagulants.   Nor were they updated with the data from the February 2001 Advisory Committee Meeting became available to the public on the FDA's website.

77.    The guidelines listed factors that increase the risk of GI bleeding, and said that COX-2 inhibitors (Celebrex and Vioxx at the time) were the drugs of choice (after acetaminophen) for people at elevated risk.   Even though the FDA reviewers dispelled that argument at the February 2001 Advisory Committee Meeting, the guidelines remained in place, not reflecting the updated information that should have caused them to be revised. Furthermore,

27

in a section of the guidelines labeled "Initiation of treatment in the patient who is not at increased

risk for an upper GI adverse event," the guidelines state:

> The approach recommended for treatment of patients not at increased risk
> for an upper GI adverse event is similar to that described above (Table 3)
> [for people at increased risk]

In other words, for patients at increased risk and for those not at increased risk of GI

complications, the guidelines recommend treatment with a COX-2 selective inhibitor if

acetaminophen does not provide adequate relief — even though the FDA GI reviewer concluded

that Celebrex offers a safety advantage for neither group. These guidelines set the standards of

good medicine and are admissible in malpractice cases as evidence of community standards.

78.     Another example of the use of manipulated studies to promote Celebrex use arises

from publication of the article *The Coxibs, Selective Inhibitors of Cyclooxygenase-2* that

appeared in the NEW ENGLAND JOURNAL OF MEDICINE, Vol. 345, No. 6, on August 9, 2001.

Though prohibited by the then editorial policy of the New England Journal of Medicine, both of

the authors received money from Searle and/or Pharmacia.   The authors concluded that, "clinical

trials have demonstrated that treatment with highly selective cyclooxygenase-2 inhibitors

[Celebrex and Vioxx] causes significantly fewer serious gastrointestinal adverse events than does

treatment with non-selective NSAIDs."   However, with the results of CLASS publicly available

on the FDA website for seven months at the time this review article was published, the authors

and Defendants were (or should have been) aware that there was no evidence of Celebrex being

less likely to cause serious GI complications than other NSAIDs.   Despite the error in this

report, reprints of it were used by Defendants' sales force to market Celebrex to doctors.

79.     Another example of the use of manipulated study data to promote Celebrex use is

contained in a corporate-sponsored review article appearing in the BRITISH MEDICAL JOURNAL

28

on September 21, 2002, where one of the authors was employed by Pfizer, which promoted falsely the

> In this review of randomized controlled trials we have shown that
> celecoxib is as effective as other NSAIDs for the relief from
> symptoms of osteoarthritis and rheumatoid arthritis. The confidence
> intervals around the point estimates of efficacy were reasonably narrow,
> which mean that it is unlikely that there were clinically important
> differences. Compared with other NSAIDs, however, celecoxib showed
> increased upper gastrointestinal safety and tolerability. Rates of
> withdrawal due to gastrointestinal adverse event, dyspepsia, and
> abdominal pain were 40-60% lower, while the incidence of ulcers and
> serious upper gastrointestinal events was 40-75% lower.

80.    This review was published 2-1/2 years after the CLASS study was completed, and Defendants were aware that CLASS did not support this conclusion, yet Defendants took no corrective steps with respect to publication of this article.

81.    Defendants even attempted to convince doctors that Celebrex was cardioprotective, with only a shred of inconclusive evidence and a wealth of scientific data to the contrary.   In 2003, Defendants disseminated to health care professionals a small study that purported to demonstrate that *"celecoxib could not only be cardio-neutral, but may even be cardio-protective."* Defendants used the inconclusive study as a basis to promote Celebrex "as a unique agent with cardioprotective properties."   *Such promotion was contrary to Celebrex's FDA approved label that expressly warned that "CELEBREX is not a substitute for aspirin for cardiovascular prophylaxis" and falsely touted Celebrex as cardioprotective.*   Such promotion increased the sale of Celebrex by falsely inflating its image as having a superior CV safety profile over alternative NSAIDs.   Even after the FDA required a black box warning on the Celebrex label warning of CV toxicity, Defendants did nothing to correct the false information they had disseminated regarding cardioprotection.

29

**G.**    **Defendants Provide Doctors With Misleading Literature**

82.    Prior to the publication of CLASS, Defendants continuously sent doctors materials that were false and misleading in order to create and expand the Celebrex markets. For example, in 1999, Defendants Searle and Pfizer co-promoted a series of slides used by the sales force, claiming that traditional NSAIDs resulted in $500 million in excess medical care costs for GI diseases. The implication intended was that Celebrex did not cause GI diseases. There was no scientific basis for such a claim and CLASS demonstrated otherwise, yet these claims stayed alive in the minds of physicians and helped promote Celebrex sales. And the FDA prohibited Defendants from even suggesting such a claim. This claim was never retracted or corrected by Defendants.

83.    In 1999, Defendants sent literature to the medical community claiming that Celebrex demonstrated "significantly fewer GI ulcers in 12-week serial endoscopy studies." After CLASS was published, Defendants never corrected the misleading impressions created by this type of statement. And, such claims were forbidden by the FDA. In fact, in 2001, the FDA required pharmacies to send a corrective letter to doctors noting that Celebrex can cause "serious gastrointestinal toxicity."

84.    At panel presentations to doctors on Celebrex, Defendants presented statistics showing costs arising from NSAID-associated GI diseases, juxtaposed against claims regarding "new Celebrex" and its effectiveness. This juxtaposition was designed to falsely convey the GI safety and cost/effectiveness of Celebrex. Also included were slides stating Celebrex "safely" delivers relief, again intending to create the false impression the older, less expensive NSAIDs were not as safe.

85.    In a January 2000 letter to thousands of "Healthcare Professionals," jointly

30

authored by Searle and Pfizer, Defendants described Celebrex as the "#1 selling brand of prescription arthritis medicine" and noted that "serious GI toxicity can occur with ... NSAIDs." The message, no such GI toxicity occurs with Celebrex, this claim was unsupported and its falsity was never corrected and is contrary to the FDA's position on the safety of Celebrex.

86.    In 2000, Pfizer and Searle sent doctors a description of Celebrex indicating that it has "excellent GI tolerability."    Again, this was part of a successful effort to create the impression that Celebrex caused significantly fewer GI problems than the older, less expensive NSAID.  This statement was misleading when made and never corrected.

87.    In 2000, Defendants jointly agreed to send doctors materials describing Celebrex as a "scientific breakthough" which was not the case. Celebrex has no "breakthrough" clinical advantage over the older, less expensive NSAIDs, and the FDA prohibited such comparative claims of superiority.

88.    In 2000, Defendants jointly agreed to send doctors materials claiming that Celebrex was more effective in pain relief than naproxen.  This claim was based on a study published in 1999 [Pharmacotherapy 19(11):1269-78, 1999], in which the primary endpoint was functional status and Celebrex and naproxen were equivalent. The finding that Celebrex reduced pain more than naproxen was post-hoc, and therefore of far less importance.  The FDA Medical Officer Review commented on the results of CLASS:

> While these protocols were not primarily intended to address
> effectiveness, it is disappointing that celecoxib at four times and twice the
> upper recommended dose for OA and RA, respectively, appeared to offer
> no substantial therapeutic gains.

89.    All of the above materials are just examples of false and misleading materials that conveyed superiority claims that persist in the medical community and led to the astounding

31

success of Celebrex.   These materials were used by the Pfizer sales force to convince doctors and Third-Party Payors of Celebrex's superiority.

**H.    Direct to Consumer Marketing and Promotion**

90.    With the knowledge that Celebrex provides no better pain relief than older anti-inflammatory drugs (in fact, all doses of Celebrex provide significantly less relief in studies of dental pain than two over the counter Advil tablets) and that Celebrex is no less likely to cause serious GI complications, Defendants continued pouring money into advertising campaigns that uniformly emphasized the GI and CV safety of Celebrex and its relief of symptoms.

91.    Pharmacia and Searle spent more than $78 million on consumer advertising for Celebrex just in the year 2000. Defendants spent more than $400 million on direct-to-consumer advertising for Celebrex from 1999 to 2003.  Defendants' direct-to-consumer advertising had as its goal convincing patients that Celebrex was clinically superior to older, less expensive NSAIDs and that they should see their doctors and request a prescription for Celebrex.  This was accomplished by use of the messages set forth below.

92.    In addition, Defendants' sales forces have blitzed doctors' offices with literature and verbal presentations designed to convince both doctors and consumers that Celebrex was a superior drug for treatment of osteoarthritis, acute pain in adults, painful menstrual cycles and other types of disease.  They aggressively promoted Celebrex as an improvement over other NSAIDs, like naproxen and ibuprofen, because it had a lower risk of side effects such as GI ulcers and bleeding and had a safe CV profile.  Defendants did not promote a fair and balanced presentation of Celebrex and promoted Celebrex in a manner inconsistent with FDA approval and Celebrex's labeling.

32

93.    Such marketing efforts to physicians have become commonplace in recent years. Drugs, including Celebrex, that might once have been used primarily by specialists are routinely promoted to, and prescribed by, doctors who are less familiar with the drugs' full research record. Drug companies, with Pfizer in the forefront, spent billions on such "detailing" to physicians — *i.e.*, sales people dropping by to leave marketing materials and drug samples, and speaking to physicians about their companies' drugs.

94.    Such large-scale marketing efforts have paid huge dividends to Defendants and other drug companies. The number of blockbuster drugs, defined as drugs with more than $1 billion in annual retail prescription sales, was only 15 in 1999 but grew to 34 in 2003.

95.    As a result of Defendants' uniformly misleading advertising campaigns, Celebrex was wildly successful. Celebrex became Pharmacia's best selling drug with more than $2.6 billion in sales for 2000 and $3.1 billion in sales for 2001.  After acquiring Pharmacia, Pfizer has continued to enjoy blockbuster sales of Celebrex, with $2.7 billion in revenue from U.S. sales (out of $3.3 billion in worldwide sales) in 2004.

I.    **Examples of Misleading Materials Designed to Promote Celebrex as Offering a Heretofore Unavailable Improvement in the Quality of Life and/or as Providing Superior Pain Relief**

96.    Despite the lack of scientific evidence to support such claims, Defendants' advertisements often focused on one of two themes that were either expressly stated or implied by the words and images.  One was that Celebrex provided previously unavailable improvements in quality of life. The second was that Celebrex provided superior pain relief.

97.    The marketing plans for Celebrex were not impeded by the FDA approval requiring a GI warning. The marketing plan went forward in large measure with a concerted effort to disguise the true scientific evidence about the safety and efficacy of Celebrex.

33

98.    From 1997 through the present, Defendants have repeatedly engaged in misleading advertising devised to portray Celebrex as safer than other pain relievers.

99.    For example, on January 29, 1999, the FDA sent Defendant Searle comments on the proposed launch marketing materials for Celebrex. The comments included criticism of the Defendants' presentation of the COX- I and COX-2 science, stating that such presentations,

> suggest that by selectively inhibiting COX-2, Celebrex$^{TM}$ does not cause the typical adverse effects on the gastrointestinal (GI) tract and platelets observed in the class of NSAIDs. This broad superiority claim comparing CelebrexTM to the class of NSAIDs is misleading because it is based on nonclinical data and is not supported by evidence found in the approved product label.

100.    The FDA further rejected any "suggestion" by graphics or through words that Celebrex has a universally superior clinical safety profile to NSAIDs as a class since such a claim had not been proven and had contradicted Celebrex's labeling that "[i]n fact, [includes] much of the class labeling for NSAIDs with regard to safety."

101.    Among multiple other concerns regarding Defendant's marketing, the FDA highlights the Defendants selective promotion of safety data at the expense of important risk information. The FDA specifically criticizes Defendant's presentation of the "Hepatic and Renal Safety Profile," in a Celebrex advertisement as follows,

> The heading "Hepatic and Renal Safety Profile" appears at the top of page 11. The information contained on this page presents several promotional claims for CelebrexTM but omits risk information contained in the PRECAUTIONS section of the product label under the subheadings Hepatic Effects and Renal Effects. For example, the product label contains the statements "Rare cases of severe hepatic reactions, including jaundice and fatal fluminant hepatitis, liver necrosis and hepatic failure (some with fatal outcome) have been reported with NSAIDs" and "Long term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury." However, none of this important safety information appears on this page. These statements would be considered false or misleading because the presentation of information under the title "Hepatic and Renal Safety Profile" that does not include relevant renal or

> hepatic precautions form the approved label is a presentation that otherwise selects information in a way that makes the drug appear to be safer than has been demonstrated.

Another concern addressed by the FDA, is the Defendants' failure to present a fair balance of Celebrex's general safety by omitting information regarding GI risks and failing to mention "significant information in the PRECAUTIONS section. For example, there is no information regarding renal or hepatic effects."

102.    Again on March 12, 1999, the FDA criticizes the Defendants Celebrex marketing as overstating efficacy, misleading regarding GI risks, failing to accurately present comparative claims and overstating the general safety. Regarding the Defendants' portrayal of the general safety of Celebrex the FDA comments,

> The audio in frame 18 states that Celebrex is "generally well tolerated." This appears in the ad before the presentation of any risk information including adverse reactions, warnings and contraindications. The term "generally well tolerated" minimizes the significance of the risk information that follows. Therefore DDMAC suggests that Searle delete this term. The ad also fails to state several other important risks associated with the use of Celebrex. Cautionary language regarding the risk to asthmatics and patients with renal disease should also be present in the ad.

103.    On October 6, 1999, the FDA sent Defendant Searle another letter regarding misleading claims with respect to Celebrex. The FDA found as follows:

NDA #20-998

- Searle claims that, "With more than 5 million patients on Celebrex, physicians know what to expect when they prescribe Celebrex — the new standard of care for analgesic and anti-inflammatory therapy in the management of pain for OA and RA." This statement makes a broad superiority claim comparing Celebrex to not only the class of NSAIDs, of which Celebrex is a member, but to all analgesic and anti- inflammatory therapies available for the management of osteoarthritis (OA) and rheumatoid arthritis (RA). However, this global superiority claim has not been demonstrated by substantial evidence. Therefore, this claim is false or misleading.

35

- Searle also presents several unsubstantiated comparative claims to Vioxx (rofecoxib), including but not limited to, "Why should I use Celebrex over Vioxx? My first response to your question leads me to ask, 'With all the experience that you and thousands of other physicians just like you have with the proven efficacy and ***benefit of superior safety of Celebrex***, why wouldn't you want to prescribe Celebrex?'" (emphasis added). This claim suggests Celebrex has a "superior safety" profile compared to Vioxx, when such has not been demonstrated by substantial evidence. Therefore, DDMAC considers this unsubstantiated comparative claim to be false or misleading.

104.    Typical of Defendants' misleading advertising is an advertisement called "Guitar TV ad." The Guitar TV advertisement in its entirety makes a representation about the indication and benefits of Celebrex for osteoarthritis or rheumatoid arthritis. A woman playing an acoustic guitar is featured. The visuals focus on her hands/fingers and playing ability (*i.e.,* she finger-picks the strings with one hand while executing chord changes with the other hand). These images are accompanied by a voice-over: "With Celebrex, I will play the long version." Together, these images and claims suggest that because of using Celebrex, there is a direct benefit to this patient's wrist/hand/finger joints related to movement and flexibility such that she can now play the long version of the song whereas she previously could not.

105.    This advertisement is just one of many designed to have consumers believe that Celebrex will provide better relief or in some way improve the quality of their lives more than older, less expensive NSAIDs, many of which are available without a prescription.

106.    Recently, the FDA issued a warning letter regarding this advertisement:

While the Guitar TV ad suggests a direct benefit to this patient's wrist/hand/finger joints related to movement and flexibility, it fails to state the actual approved indication (*e.g.,* relief of signs and symptoms of osteoarthritis). It also fails to include any risk information about Celebrex, thus omitting the major side effects and contraindications (including warnings and precautions) of Celebrex as required by 21 C.F.R 202.1(e)(1). Omission of this information implies that there are no risks to the patient who takes Celebrex, which overstates the drug's safety.

107.    Similarly the FDA found another Celebrex TV advertisement to be misleading. The FDA described this advertisement as follows:

> *Announcer: "Celebrex presents, arthritis tips."*
>
> Woman dressed as doctor: "Arthritis is the most wide-spread crippling disability in the United States today. Arthritis is the predominant cause of activity limitations and is a major determinate of nursing home institutionalization for the elderly. One out of every 7 people and 1 in every 3 families is affected by arthritis. If you feel any pain or discomfort in your joints, contact your local doc."
>
> *Announcer: "These arthritis tips have been brought to you by Celebrex."*

108.    The FDA found this advertisement to be misleading.

> The Arthritis Tips TV ad is a product-specific drug ad for Celebrex that is misleading because it omits important information about the drug's safety and effectiveness and makes unsubstantiated effectiveness claims. The ad promotes Celebrex by identifying the drug by name at the beginning and end of the ad. Moreover, stating that Celebrex is presenting/bringing you arthritis tips clearly suggests that Celebrex is an arthritis treatment. The Arthritis Tips TV ad purports to quantify the disease burden of "arthritis" ("the most wide-spread crippling disability in the United States today ... the most predominant cause of activity limitations and ... a major determinate of nursing home institutionalization for the elderly. One out of every 7 people and 1 in every 3 families is affected by arthritis.") Finally, the Arthritis Tips TV ad directs viewers to contact their local doctor "if you feel any pain or discomfort in your joints" and follows this statement with another reference to Celebrex.

> <u>Overstatement of Effectiveness</u>. The Arthritis Tips TV ad is misleading because it overstates the proven effectiveness of Celebrex for the treatment of "arthritis." The Arthritis Tips TV ad discusses the serious progressive effects of arthritis, noting that it commonly can lead to "crippling disability" and "nursing home institutionalization of the elderly." The viewer is then instructed "if you feel any pain or discomfort in your joints, contact your local doc. These arthritis tips have been brought to you by Celebrex." The totality of this presentation therefore suggests that Celebrex is an effective treatment for preventing or modifying the progression of arthritis, such that crippling disability and nursing home institutionalization may be avoided.

> Celebrex is indicated only for relief of the signs and symptoms of OA and RA. Celebrex is not indicated for disease modification (*i.e.*, altering the

37

course of the progression of arthritis). Moreover, we are not aware of substantial evidence or substantial clinical experience demonstrating that treatment with Celebrex will prevent crippling effects or disability due to arthritis or prevent nursing home institutionalization of elderly patients with arthritis. Therefore, your Arthritis Tips TV ad greatly overstates the proven benefits of Celebrex.

Omission of Risk Information. The Arthritis Tips TV ad fails to disclose any risk information about Celebrex and thus omits the major side effects and contraindications (including warnings and precautions) of Celebrex as required by 21 C.F.R. 202.1(e)(1). Omission of this information implies that there are no risks to the patient who takes Celebrex, thus overstating its safety.

109.    In the same letter the FDA found that various Celebrex print advertisements made

unsubstantiated claims with respect to less expensive alternative drugs:

Unsubstantiated Superiority Claims

The print ad features the prominent headline "Strength They Can Stay With" and shows a chart comparing Celebrex, Ibuprofen and Naproxen, titled "6-Month Patient Persistency Rate." Over the chart is the statement, "In a study of approximately 1 million patients, persistency rates of different OA/RA treatments were assessed at 6 months." The tagline below the Celebrex logo in the print ad is "Proven strength that lasts."

The above referenced claims imply that Celebrex is more effective (*i.e.,* stronger) than ibuprofen and naproxen for treatment of osteoarthritis or rheumatoid arthritis and that patients "stay with" or are more compliant with Celebrex therapy than the compared products. We are not aware of substantial evidence or substantial clinical experience to support these claims. The cited retrospective retail pharmacy database analyses by NDC Health, "Persistency Analysis: Celebrex, Vioxx, and All Other NSAIDs," August 2002 and "Persistency Analysis: Celebrex, Vioxx, Ibuprofen, and Naproxen," from November 2002 (almost 2 years ago), do not contain any data or information demonstrating that patients found Celebrex to be more effective than the other products, or that patients will be more "persistent" or compliant with Celebrex therapy. Moreover, the database information did not note the indication for which the drug was prescribed, so the suggestion that these rates reflect specifically OA/RA patients is misleading. In addition, the analyses do not account for factors that affect persistence or compliance such as cost insurance coverage, side effects, dosage regimen, and ease of use. Therefore, the analyses do not constitute substantial evidence or substantial clinical experience demonstrating that OA/RA patients are more compliant with Celebrex or stay on Celebrex

38

longer because it is more effective than other products for the treatment of OA or RA.

110.    Since its introduction, Defendants have issued promotional material designed to tie Celebrex to improving quality of life.  It has distributed materials making numerous dramatic claims tied to the drug regarding quality of life, in terms of being able to do personal and work-related activities.  A Pfizer infomercial shows people returning to their work and activities.  These patients go from not being able to work or do anything they want to do, to being able to work and do everything they want to do, pain-free.  Patients talk about being able to "do anything," "do as much as I want to do," being "back to doing what I do," and such.  They talk about "enjoying life" again, how the drug improved their "quality of life," and how the drug "gave them back their lives" (a theme repeated over and over in the advertisement and in the background music).  One person states that "you can be free."  Another states that the medicine "brought new vitality in life." Everyone portrayed has 100% efficacy in all of these outcomes.

111.    Such claims are misleading and purport to promote Celebrex as superior.   In fact, as the FDA has recently noted, "none of the comparative studies with naproxen, ibuprofen, and diclofenac to-date has been designed to demonstrate superiority or a specified degree of similarity in a rigorous way."

112.    In addition, Defendants designed, approved and caused to be published the following advertisements which were designed to appeal to consumers or doctors which misstated or deceptively conveyed Celebrex's superiority.

113.    TELEVISION ADVERTISEMENT:  *The "I Will Not" advertisement*.  This campaign, ran in October 2003 and April 2004, portrays people engaging in various physical activities.  The tag line for the advertisement is "With Celebrex I will not ..."  This is followed by various variations in this theme.

39

a.     The advertisement shows a woman jogging with announcer stating: "With Celebrex I will no longer give in to the joint pain of osteoarthritis. Just one Celebrex provides up to 24 hour relief from the pain of osteoarthritis."

b.     The advertisement shows a woman playing golf with announcer stating: "With Celebrex I will not stop at 9 when I really want to play 18." The announcer further states: "With Celebrex I will not settle for part time relief. If you are struggling with joint pain maybe you should stop trying to manage it by yourself."

c.     The advertisement shows a woman running on a beach, a woman playing golf, people doing tai chi, a man pitching softball, a couple hiking, a man pushing a child on a merry-go-round, a man swimming and a woman kayaking. The advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen that says, "Individual results may vary."

114.   Each of the "I Will Not" foregoing advertisement scenes overstates the effectiveness of Celebrex.   Each implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. And each misrepresents the fact that the relief provided by Celebrex is not superior to that provided by older, less expensive NSAIDs, several of which are available without a doctor's prescription. The small disclaimer regarding individual results does not effectively counter or balance the overall intended message of this advertisement.

115.   The "I Will Not" advertisement makes unsubstantiated superiority claims. By stating that "if you are struggling with joint pain maybe you should stop trying to manage it by yourself" the advertisement falsely implies that Celebrex is superior to over-the-counter

40

NSAIDs, and created unnecessary physician visits by conveying the message a doctor can prescribe a medication that is superior to those available without a prescription.

116.  TELEVISION   ADVERTISEMENT:     *The   "Fixing   the   Preschool"*
*advertisement*.  The theme of this campaign, which ran during May 2001, is a group of people fixing up a building that will be a preschool. The advertisement starts out with the voice-over: "If you have osteoarthritis there is reason to celebrate ... Celebrex."  The advertisement then shows people engaging in various activities repairing the schoolhouse. It shows a man on a ladder taking down a sign with the text: "Mark, arthritic shoulder." It shows a woman cleaning a blackboard with the text: "Sarah, arthritic back." The announcer states, "Celebrex specifically targets only the Cox-2 enzyme — a key source of arthritis pain. Celebrex relieves arthritis pain plus stiffness too."  The advertisement shows a woman working with a trowel, with the text: "Julia, arthritic hands."  The announcer states: "Powerful 24 hour relief from osteoarthritis pain, inflammation and stiffness."  The advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen that says "Individual results may vary."

117.  This campaign overstates the effectiveness of Celebrex and implies complete pain relief and complete return of movement and functionality for all patients, which is not representative of the results from Celebrex clinical trials.  The small disclaimer regarding individual results does not correct, counteract or balance the overall message of this advertisement.

118.  This advertisement campaign makes unsubstantiated superiority claims. By stating that "Celebrex specifically targets only the Cox-2 enzyme — a key source of arthritis pain," it falsely implies that Celebrex is superior to other NSAIDs.

41

119.    TELEVISION ADVERTISEMENT: *"The Softball Game" Advertisement*. The theme of this advertisement, run during September 2000 and May 2001, is a softball game. The advertisement starts out with the announcer stating: "If you have osteoarthritis there is reason to celebrate ... Celebrex." The announcer states: "Celebrex specifically targets only the Cox-2 enzyme — a key source of arthritis pain. 24 hour relief from pain and stiffness." The ad shows a woman helping a young boy to bat, with the text: "Jill, arthritic hands." It shows a group of women doing the wave, with the text: "Rita, arthritic back." It shows the umpire raising his arms overhead, with the text: "John arthritic shoulder." The advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen that says "Individual results may vary."

120.    This advertisement overstates the effectiveness of Celebrex. It implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. The small disclaimer regarding individual results does not correct, counteract or balance the overall message of this advertisement.

121.    This advertisement makes unsubstantiated superiority claims. By stating that "Celebrex specifically targets only the Cox-2 enzyme — a key source of arthritis pain" it falsely implies that it is superior to other NSAIDs.

122.    TELEVISION ADVERTISEMENT: *"A Day in the Park" Advertisement*. The theme of this advertisement, which ran during November 2000, is people engaging in various activities in a park. The advertisement starts with a theme song "celebrate, celebrate do what you like to do." The announcer states: "If you have osteoarthritis there is reason to celebrate it's Celebrex. Powerful 24 hour relief from osteoarthritis pain and stiffness. Celebrex is the first arthritis medicine that targets only the Cox-2 enzyme." The advertisement shows people doing

42

tai chi, with the text: "Ann, arthritic shoulder." The ad shows a man and a child riding push scooters, with the text: "Bill, arthritic knee." It shows a man rowing a boat with the text: "Dave, arthritic shoulder." It shows a woman pushing a child on a swing with the text: "Liz, arthritic back." The advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen that says "Individual results may vary."

123.     This advertisement overstates the effectiveness of Celebrex. The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. The small disclaimer Regarding individual results does not correct, counteract or balance the overall message of this advertisement.

124.     This advertisement makes unsubstantiated superiority claims. By stating: "Powerful 24 hour relief from osteoarthritis pain and stiffness. Celebrex is the first arthritis medicine that targets only the Cox-2 enzyme." The ad falsely implies that Celebrex is superior to other NSAIDs.

125.     TELEVISION ADVERTISEMENT: *"I Will Not ..." Advertisement #2*. The advertisement portrays people engaging in various physical activities. The tag line for the ad is: "With Celebrex I will not give in to the pain of osteoarthritis." The advertisement shows a man swimming, a couple canoeing and a woman running. The announcer states: "Just one Celebrex provides up to 24 hour relief from the pain of osteoarthritis." The ad shows a woman playing golf with a voice over: "With Celebrex I can line up my putt." It shows woman playing a guitar with the voice over: "I can play the long version." The announcer states: "One pill, 24 hours so you can live your life the way you want. With Celebrex I will not settle for part time relief." The advertisement shows people hiking, a woman painting a chair, a man fishing, a woman

43

playing a guitar, people doing yoga and a man pushing a merry-go-round.  The announcer states, "If you are suffering from pain, inflammation or stiffness maybe you should stop trying to manage it on your own."  The advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen that says "Individual results may vary."

126.    This advertisement overstates the effectiveness of Celebrex. It implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. The small disclaimer regarding individual results does not correct, counteract or balance the overall intended message of this advertisement.

127.    The advertisement makes unsubstantiated superiority claims. By stating that "if you are suffering from pain, inflammation or stiffness maybe you should stop trying to manage it on your own," the advertisement implies that it is superior to over-the-counter NSAIDs which is not supported in clinical trials. By stating, "with Celebrex I will not settle for part time relief," the advertisement implies that it is superior to other arthritis treatments which is not supported in clinical trials.

128.    TELEVISION ADVERTISEMENT:  *"Dancing" Advertisement.*   The theme of this advertisement, which ran during July 2002, is people dancing.  The advertisement shows a couple dancing with a voice over that states: "Even with osteoarthritis these arms still have a way with the ladies."   The text on screen says: "Arthritic Elbow."  The next scene shows a woman dancing, with a voice over that states: "These legs hardly miss a beat" with text "arthritic knee." The next scene shows a couple dancing, with the voice over: "These hands haven't lost their touch" with text "arthritic hands."  The announcer states: "Just one Celebrex last 24 hours. Provides powerful arthritis pain relief that is non-narcotic."  The advertisement has additional

44

footage of the above people dancing. The advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen that says "Individual results may vary."

129.    This advertisement overstates the effectiveness of Celebrex. It implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. The small disclaimer regarding individual results does not correct, counteract or balance the overall message of this advertisement.

130.    Each of the foregoing advertisements, and Defendants' overall advertisings or marketing program for Celebrex, consistently and uniformly failed to disclose the increased risk of heart problems that were known to Defendants at the time Celebrex was launched. Defendants concealed a study completed June 24, 1999 comparing Celebrex to placebo for the slowing of the progression of Alzheimer's Disease and overall safety. Patients taking Celebrex were 3.6 times more likely to experience a serious cardiovascular event (2.1% of patients taking placebo vs. 7.7% of patients taking Celebrex).[6]  Pfizer's report of this study shows that the increased risk of CV complications in patients taking Celebrex was statistically significant.[7] Furthermore, among patients taking Celebrex there were 12% more serious adverse events (25.6% vs. 22.9%) and 59% more deaths (4.6% vs. 2.9%). The study was never published and was not presented to the FDA in time to be included in the February 2001 Advisory Committee Meeting that considered the safety of Celebrex. Had the findings from this study been published and disclosed to the FDA in a timely manner, sales of Celebrex — based primarily on the claimed safety advantage

---

[6] Letter to FDA revealing heart dangers in an unpublished clinical trial of Celebrex (HRG Publication #1721), Public Citizen, January 31, 2005. http://citizen.org/publications/release.cfm?ID=7359.
[7] A statistically significant difference favoring placebo in adverse events was observed for certain CV-related body system terms (Cardiovascular Disorders, General; Heart Rate and Rhythm Disorders; Myo, Endo, Pericardial & Valve Disorders). These differences were primarily driven by the individual terms cardiac failure, fibrillation atrial, and angina pectoris. http://www.clinicalstudyresults.org/documents/company-study_76_0.pdf.

over older, less expensive NSAIDs — would have been dramatically less. These findings would have been of singular importance to prescribing doctors given the concern, appropriately expressed in the JAMA article reporting the first six months of the CLASS study, about the theoretical risk of increased adverse events disturbing the clotting balance with selective COX-2 inhibition:

> Although it has been hypothesized that COX-2—specific inhibitors might increase the risk of cardiovascular thromboembolic events via inhibition of vascular prostacyclin synthesis without a corresponding inhibition of platelet thromboxane, no such increase was evident in the current study.

Defendants' failure to make the results of this study available are particularly vexing, because it was completed eight months before the CLASS study was completed, and its results should have informed the report published in JAMA.

131.    Despite Defendants' knowledge of increased CV risk with Celebrex, Defendants promoted it as having CV benefits.

132.    As part of the scheme alleged herein, Defendants engaged in a massive direct-to-consumer advertising campaign in the print media designed to create consumer demand for Celebrex.  The following is a sampling of such advertisements.

46



133.    This advertisement, which ran during October 2003, overstates the effectiveness of Celebrex. The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. It also seeks to bolster its image and acceptance by claiming that 23 million people are using it and by virtue of the fact it is the "#1 doctor-prescribed drug." However, these figures, if true, are misleading by virtue of acceptance of Celebrex was the result in large measure to Defendants' deceptive scheme for marketing Celebrex.

47



134.    This advertisement, which ran during January 2000, overstates the effectiveness

of Celebrex. The advertisement implies complete pain relief and complete return of movement

and functionality for all patients which is not representative of the results from Celebrex clinical

trials. This advertisement makes unsubstantiated superiority claims. The advertisement claims

that Celebrex is a "breakthrough" implying that it is superior to other NSAIDs, a claim which is

not supported in clinical trials, and in fact is misleading, given the lack of statistical significance

between Celebrex and older NSAIDs, and the lack of disclosure of the cardiovascular risks

48

presented by Celebrex. It also represents that it is the "#1 selling brand" which would not have

been the case if Defendants had not engaged in the unlawful scheme described herein.



135.    This advertisement, which ran during March 2000, overstates the effectiveness of Celebrex. The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. This advertisement makes unsubstantiated superiority claims without disclosure of cardiovascular risks. The advertisement claims that Celebrex is a "breakthrough" implying that it is superior to other NSAIDs which is not supported in clinical trials.

50



136.    This advertisement, which ran during January 2001, overstates the effectiveness of Celebrex. The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. This advertisement makes unsubstantiated superiority claims. By stating that it is the "first

51

arthritis medicine that targets only the COX-2 enzyme" it wrongly implies that it is superior to other NSAIDs and fails to disclose the cardiovascular risks associated with Celebrex, thus implying it is cardiovascularly safe.

 

137.    This advertisement, which ran during June 2001, overstates the effectiveness of Celebrex. The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. This advertisement makes unsubstantiated superiority claims and fails to disclose the cardiovascular risks associated with Celebrex. By stating that it is the "first arthritis medicine that targets only the COX-2 enzyme" it falsely implies that it is superior to other NSAIDs.

52



138.    This advertisement, which ran during May 2001, overstates the effectiveness of

Celebrex. The advertisement implies complete pain relief and complete return of movement and

functionality for all patients which is not representative of the results from Celebrex clinical

trials. This advertisement makes unsubstantiated superiority claims without disclosure of the

cardiovascular risks associated with Celebrex. By stating that it is the "first arthritis medicine

that targets only the COX-2 enzyme" it falsely implies that it is superior to other NSAIDs.



## What will you do on the day you discover Celebrex?

**CELEBREX**

139.    This advertisement, which ran during February 2000, overstates the effectiveness of Celebrex. The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. This advertisement makes unsubstantiated superiority claims and implies cardiovascular safety by not including the cardiovascular risks. The advertisement claims that Celebrex is a "breakthrough" falsely implying that it is superior to other NSAIDs.

54



140.    This advertisement, which ran during September 1999, overstates the

effectiveness of Celebrex. The advertisement implies complete pain relief and complete return of

movement and functionality for all patients which is not representative of the results from

Celebrex clinical trials. This advertisement makes unsubstantiated superiority claims and implies

that Celebrex is safe cardiovascularly. The advertisement claims that Celebrex is a

"breakthrough" falsely implying that it is superior to other NSAIDs.



141.    This advertisement, which ran during July 2004, overstates the effectiveness of

Celebrex. The FDA warned Defendants that it was misleading, failed to disclose risk

information, and overstated the effectiveness of Celebrex. The advertisement implies complete

pain relief and complete return of movement and functionality for all patients which is not

representative of the results from Celebrex clinical trials.

**Celebrex Physician Directed Ads**



142.   This advertisement, which ran during July 2000, makes unsubstantiated superiority claims, By comparing the effectiveness of Celebrex to naproxen the advertisement falsely implies that it is superior to other NSAIDs. The statement "Excellent GI tolerability" is false and misleading, particularly in light of the reference to GI complications for NSAIDs with no such mention of complications for Celebrex. Further, contrary to the advertisement's claim, Celebrex did not show excellent GI tolerability. Rather, its tolerability was no different than NSAIDs and in fact the CLASS study showed increased complications from Celebrex.

57

## Choose CELEBREX and BEXTRA
# for reduced GI risk

■ **NSAIDs are widely misused** and this may have serious consequences

- Most Americans do not completely read OTC NSAID labels[4]
- Many adults take OTC NSAIDs, including low-dose aspirin, excessively[4]
- NSAIDs may cause serious GI complications, even death[11]

■ **CELEBREX demonstrates superior GI safety in older patients compared with nonspecific NSAIDs[13]**

 

143.    This excerpt from an October 2003 brochure disseminated to formulary decision makers falsely touts the GI superiority of Celebrex.[8]  The Defendants' scare campaign against traditional NSAIDs is designed to discourage their use while falsely implying Celebrex has less comparable GI toxicity.   The advertisement provides an example of another of Defendants' misleading marketing weapons – namely, portraying subsets of data from studies in graphic formats that purport to show benefits of Celebrex supported by scientific data, but which are not scientifically supportable, since the new subset was not a part of the original study.   The FDA warned the Defendants that use of such subcategories of data would be misleading in advertisements.   The Defendants, however, continued to use this tool of manipulation throught their marketing campaigns for Celebrex.

---

[8] This excerpt appears on bates number Cele NDA 20-998  00020136 of Defendants' document attached hereto as Exhibit 1.



144.    This excerpt from an October 2003 brochure entitled "Important Information for

Orthopedic Specialists" falsely portrays Celebrex as superior to NSAIDs.[9]  The advertisement

insists, falsely, that such a proclamation of superiority is "proven."  The advertisement is false

because, as the Defendants knew and the as the FDA had repeatedly commented, there is no

scientific basis for such as superiority claim.  Such advertisements caused doctors to prescribe

Celebrex based on Defendants' unsubstantiated and inaccurate claims.

---

[9] This exceprt appears on bates number Phelan-K 10000566225 of Defendants' document attached hereto as Exhibit
2.

59





60

145.    The above three advertisements, which ran during February and March 2004, are misleading.  In a letter to Pfizer the FDA stated: "The print ad features the prominent headline "Strength They Can Stay With" and shows a chart comparing Celebrex, Ibuprofen, and Naproxen, "6-Month Patient Persistency Rate."  Over the chart is the statement, "In a study of approximately 1 million patients, persistency rates of different OA/RA treatments were assessed at 6 months."  The tagline below the Celebrex logo in the print ad is "Proven Strength that lasts."

146.  In the letter to Pfizer, the FDA stated:

> The above referenced claims imply that Celebrex is more effective
> (*i.e.*, stronger) than ibuprofen and naproxen for treatment of osteoarthritis or
> rheumatoid arthritis and that patients "stay with" or are more compliant with
> Celebrex therapy than the compared products.  We are not aware of
> substantial evidence or substantial clinical experience to support these claims.
> The cited retrospective retail pharmacy database analyses by NDC Health,
> "Persistency Analysis: Celebrex, Vioxx, and All Other NSAIDs," August
> 2002 and "Persistency Analysis: Celebrex, Vioxx, Ibuprofen, and Naproxen,"
> from November 2002 (almost two years ago), do not contain any data or
> information demonstrating that patients found Celebrex to be more effective
> than the other products, or that patients will be more "persistent" or compliant
> with Celebrex therapy.  Moreover, the database information did not note the
> indication for which the drug was prescribed, so the suggestion that these
> rates reflect specifically OA/RA patients is misleading.  In addition, the
> analyses do not account for factors that affect persistence or compliance such
> as cost insurance coverage, side effects, dosage regimen, and ease of use.
> Therefore, the analyses do not constitute substantial evidence or substantial
> clinical experience demonstrating that OA/RA patients are more compliant
> with Celebrex or stay on Celebrex longer because it is more effective than
> other products for the treatment of OA or RA.

## J.    False Promotion of Cardiovascular Safety

147.    The CLASS studies published in 2000 assessed the incidence of clinically significant upper GI events seen over one year of treatment with Celebrex, compared to ibuprofen and diclofenac. A post-hoc analysis was done between those patients taking low-dose aspirin for cardioprotection and those patients not taking low-dose aspirin. The published article found that the incidence of cerebrovascular accident, myocardial infarction, and angina was not

61

statistically different among patients taking the three drugs. However, the published data only reflected a 6- month period, used by the company to espouse an unsupportable claim of decreased GI toxicity.

148.    The 12-month data set available from the FDA revealed that the rate of combined anginal adverse events was 1.4% in the celecoxib group versus 1.0% in either NSAID group. This tendency toward increased cardiovascular toxicity was described by the FDA Medical Officer Dr. Witter, "[f]or anginal disorders (especially the combined disorders), *there seems to be a trend toward more [cardiac adverse] events in those patients receiving celecoxib*, regardless of aspirin use." Had the results of the Alzheimer's study completed in 1999 been made available to the FDA, its Medical Officers surely would have given this finding greater significance.

149.    This trend toward more cardiac adverse events was *magnified* in those patients not taking low-dose aspirin. Combined anginal disorders were increased in these patients; the celecoxib group had 0.6% vs. 0.2% and 0% in the diclofenac and ibuprofen groups, respectively. There were also more combined atrial serious cardiac adverse events with celecoxib, 0.3% compared to 0.1% and 0% in the diclofenac and ibuprofen groups, respectively. Dr. Witter commented, "In the non-aspirin users, there appears to be a slight trend toward more [serious cardiac adverse] events in those patients receiving celecoxib for combined atrial and anginal disorders." Additionally, the rate of myocardial infarction was higher in the celecoxib group, 0.2%, compared with the other two drugs, 0.1%. Dr. Witter also referred to data from the original NDA for celecoxib in his discussion, "[t]here were suggestions of a dose-response relationship (...100 mg BID celecoxib, 0% crude mortality rate vs. 400 mg BID celecoxib, 0.64% crude mortality rate) between cardiovascular mortality

62

and [increased] celecoxib use that could not be adequately addressed by the data."

150.    The FDA was concerned enough to order a cardiorenal consult by FDA Medical Officer Dr. Throckmorton on the same CLASS study data. His report noted, "[t]he CLASS trial data do not support a large adverse effect of celecoxib on cardiovascular mortality or on serious adverse events related to thrombosis relative to either diclofenac or ibuprofen. The data do not exclude a less apparent pro-thrombotic effect of celecoxib, such as might be reflected in the relative rates of cardiac adverse events related to ischemia."

151.    The FDA further determined that valuable CV safety data showing that Celebrex had similar cardiovascular toxicity to ibuprofen and diclofenac be added to the label. The Defendants falsely promoted these additions to the Celebrex label as a "reaffirm[ance]" by the FDA of Celebrex's CV safety profile. In a June 7, 2002 press release, Defendants announced that the required label changes, "reaffirms the cardiovascular safety profile of Celebrex." This statement is false especially in light of the changes made to the label including the inclusion of the additional cardiovascular adverse events, "angina pectoris, coronary artery disorder, [and] myocardial infarction" to the Adverse Reactions section of the label.

152.    The Defendants' massive marketing campaign proclaimed that CLASS revealed no cardiovascular signals.   In an August 2001 Dear Patient letter provided to doctors for distribution to their patients, Defendants claimed,

> [y]ou may have seen recent news reports about safety issues, specifically heart attacks and strokes, involving our prescription arthritis drug, CELEBREX® (celecoxib capsules). We are concerned that these reports may have caused you to worry about taking CELEBREX. We want to assure you that CELEBREX has demonstrated no increased risk for heart attack and stroke compared

63

with commonly used arthritis medications such as naproxen and ibuprofen, against which it was studied in more than 40,000 patients.

This was materially false and caused doctors to prescribe Celebrex, and End-Payors to purchase it.

153.   In a June 7, 2002 press release regarding the Celebrex label revision that resulted from the CLASS studies, and even though in internal documents CV additions to the label were described by Defendants as a "worse case scenario," Defendants proclaimed,

> [t]he revised label reaffirms the cardiovascular safety profile of CELEBREX...Additionally, the CELEBREX cardiovascular safety profile is supported by the studies conducted for the [NDA] and other post-marketing surveillance worldwide covering an estimated 34.5 million patients or 17.25 million patient-years of exposure...and is consistent with data reported to the FDA.

These statements were false because they implied that Celebrex actually had a superior cardiovascular safety profile, and that the FDA agreed. However, no such superiority claim was evidenced in either the scientific data available or in Celebrex's approved labeling.

154.   To the contrary, the FDA reviewers' recommendations regarding the CLASS data were,

> Our findings suggest a potential increase in cardiovascular event rates for the presently available COX-2 inhibitors . . . definitive evidence of such an adverse effect will require a prospective randomized clinical trial . . . Given the remarkable exposure and popularity of this new class of medications, we believe that it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents. Until then, we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity.

Although employing a placebo group from a different trial weakens the validity of their analysis, the authors' call for a prospective randomized clinical trial powered to truly analyze the cardiovascular risk to benefit ratio was then exactly correct. Recently, however, such a placebo-

64

controlled trial of celecoxib has clearly demonstrated this risk (as did the Alzheimer's study that was completed in 1999, but not disclosed to the FDA in a timely fashion).

155.    This trial was the APC colon polyprecurrence prevention study, in which approximately 2,000 patients took celecoxib or a placebo. Interestingly, this was the longest celecoxib trial to date, with a mean duration of treatment of 33 months, as opposed to the much shorter 12-month duration of the CLASS studies. A statistically significant elevation in the risk for a major fatal or non-fatal cardiovascular event (a composite endpoint of cardiovascular death, acute myocardial infarction, and stroke) was seen in those patients taking celecoxib compared to those in the placebo group. This followed a dose-response relationship: the relative risk at 400 mg/day of celecoxib was 2.5 while the relative risk at 800 mg/day was 3.4.    Because of this unacceptable danger, the trial was prematurely halted. The FDA released an explanatory statement which said, "While we have not seen all available data on Celebrex, these findings are similar to recent results from a study of Vioxx (rofecoxib), another drug in the same class as Celebrex. Vioxx was recently voluntarily withdrawn by Merck."

156.    Given the above data and trends, Defendants' advertising and promotional campaigns touting the cardiovascular safety or superiority of Celebrex were misleading. This trend to promote the CV safety of a drug in the face of increasing scientific data of its CV risk, is even more alarming in view of the 1999 Alzheimer's study that was unpublished and showed patients taking Celebrex were more likely than those taking a placebo to have heart attacks. Though the study was small, its conclusions contradicted years of claims by Defendants that no trial of Celebrex had ever shown adverse cardiac results.

157.    The Alzheimer's study, Defendants' protocol number IQ5-97-02-001, was completed June 24, 1999 and compared Celebrex to placebo for the slowing of the progression of

65

Alzheimer's Disease and overall safety.  In this study, patients taking Celebrex were 3.6 times more likely to experience a serious cardiovascular event (2.1% of patients taking placebo vs. 7.7% of patients taking Celebrex).[10]  Defendants' internal, final report of this study shows that the increased risk of cardiovascular complications in patients taking Celebrex was statistically significant.[11]    Furthermore, among patients taking Celebrex there were 12% more serious adverse events (25.6% vs. 22.9%) and 59% more deaths (4.6% vs. 2.9%). The study was never published and was not presented to the FDA in time to be included in the February 2001 Advisory Committee Meeting that considered the safety of Celebrex.   Had the findings from this study been published and disclosed to the FDA in a timely manner, sales of Celebrex — based primarily on the claimed safety advantage over older, less expensive NSAIDs — would have been dramatically less.   These findings would have been material to prescribing doctors given the concern, appropriately expressed in the JAMA article reporting the first six months of the CLASS study, about the theoretical risk of increased adverse events disturbing the clotting balance with selective COX-2 inhibition:

> Although it has been hypothesized that COX-2 specific inhibitors might increase the risk of cardiovascular thromboembolic events via inhibition of vascular prostacyclin synthesis without a corresponding inhibition of platelet thromboxane, no such increase was evident in the current study.

Defendants' promotion of the cardiovascular safety of Celebrex despite the results of this study are particularly vexing, because it was completed eight months before the CLASS study was completed, and its results should have informed the report published in JAMA.

---

[10] Letter to FDA revealing heart dangers in an unpublished clinical trial of Celebrex (HRG Publication #1721), Public Citizen, January 31, 2005.  http://citizen.org/publications/release.cfm?ID=7359.

[11] A statistically significant difference favoring placebo in adverse events was observed for certain CV-related body system terms (Cardiovascular Disorders, General; Heart Rate and Rhythm Disorders; Myo, Endo, Pericardial & Valve Disorders). These differences were primarily driven by the individual terms cardiac failure, fibrillation atrial, and angina pectoris. http://www.clinicalstudyresults.org/documents/company-study_76_0.pdf.

158.    Defendants' 1999 results as to the CV risks presented by Celebrex were confirmed in a study by New Zealand's Medical Research Institute, which found that patients taking Celebrex had a cardiovascular risk as great as those taking Vioxx.

159.    Despite these clear indications of cardiovascular risk, Defendants geared their marketing strategy to tout the CV safety of Celebrex over other NSAIDs.  The following excerpt from a sales training presentation in April of 2004 demonstrates that Defendants entire marketing strategy regarding CB risks involved converting those risks into a selling tool.  The slide is misleading because it falsely promotes Celebrex as having a CV advantage over other NSAIDs. It also falsely implies that Celebrex is actually safe from a cardiovascular standpoint, even though Celebrex was required to carry a warning of CV adverse events in its label.[12]

[12] This excerpt appears on bates number DeShor_D 10000001233 of Defendants' document attached hereto as Exhibit 3.

67



In concert with Bruce and Amy, we have selected 4 important selling tools to highlight today which provide the foundation outlining selling messages and materials for planning in advance of the Ft Lauderdale Meeting

The first of 2 clinical issues tools to help expand time and identify patients who would benefit from the efficacy and safety of Bextra and Celebrex is the Cox-2 Edge CV Advantage Kit. The CV kit begins with a 4-page Flashcard presenting portfolio efficacy and safety advantages.

A kit contains a slide set on CD presenting the clinical advantages of our Cox-2 portfolio in patients with hypertension, peripheral edema, history of MI and are taking cardioprotective aspirin. The tools in this kit represent additional and important messages to help representatives identify patients who may benefit from Bextra and Celebrex.

Consider recommending your team use this kit to build upon the master visual aid to support dinner programs, lunch n learns, and small group presentations. Of special note several elements of this kit are also leave-behinds, including the slide set

160. In the following advertisement, Defendants tell consumers they want to "ease your mind" about Celebrex and show them its "strong cardiovascular safety." This advertisement is misleading because Celebrex was not "safe" from a cardiovascular standpoint. To the contrary, it

68

had a specific warning of cardiovascular adverse events in its FDA approved label. Defendants

went even further though, and pronounced that Celebrex has "strong cardiovascular safety." Such

a claim is false, directly contradicted the FDA approved labeling, and caused doctors to prescribe

consumers to purchase Celebrex.[13]

---

[13] This excerpt appears at bates number CeleNDA 20-998 00023822 of Defendants' document attached hereto as Exhibit 4.

69

# Celebrex has been making people with pain and arthritis feel better for years.

## And now we want to ease your mind too.

You've probably heard that Vioxx, a COX-2 drug for arthritis and pain, has been withdrawn from the market because it increased the risk of heart attacks and strokes. But, the information below should make you feel good about Celebrex, which is also a COX-2 drug.

**Celebrex is in the same general medication class as Vioxx, but it's not the same medicine.**

Each COX-2 medicine has it's own chemical structure. And at the molecular level, small differences in the chemical structure can make a big difference in how they affect you. What's true of one drug is not necessarily true of the other.

**Important patient studies with Celebrex show strong cardiovascular safety.**

- Numerous studies of Celebrex showed no increased risk of heart attacks or strokes'
- In a recent FDA sponsored study of 1.4 million patients, those who received Celebrex showed no increased risk of heart attacks'
- Patients treated in clinical studies of up to 4 years show no increased cardiovascular safety concerns

**Over 27 million people' have turned to Celebrex to ease their pain.
Ask your doctor if Celebrex is right for you.**

Of course, medications have risks and benefits. Be sure to consult with your healthcare professional about any questions you may have regarding Celebrex. If you would like more information about Celebrex, go to www.celebrex.com

161.    The advertisement below, which was part of a Q&A reference disseminated to consumers, is false and misleading in that it states that Celebrex does not increase cardiovascular risk, implies that there are no studies that show that Celebrex does increase the risk for heart attacks, strokes and death, and made the very claims that Celebrex is superior to other NSAIDs in terms of cardiovascular safety which the FDA did not permit.[14]

---

[14] This excerpt appears at bates number Cele NDA 20-998 00023927 of Defendants' document attached hereto as

70

Q     **Does CELEBREX increase the risk of stroke, heart attack, or death by effects on the heart or blood vessels?**

A     In numerous studies, CELEBREX did not increase the risk of heart attack, stroke or death caused by heart attack or stroke compared to patients taking traditional arthritis medications or a sugar pill.[1]

Q     **Does CELEBREX increase the risk of high blood Pressure or swelling?**

A     At up to 4 times the usual dose for arthritis joint pain, CELEBREX is less likely to increase these risks than prescription ibuprofen (the main ingredient in Advil®). The study shows that more people who took prescription ibuprofen had high blood pressure and swelling than those who took CELEBREX.[2]

162.    In contrast to the prominent display and wide dissemination of studies that Defendants used to highlight alleged advantages of Celebrex, scientific articles that portrayed Celebrex in a negative light, actually showing that it was more cardiovascularly dangerous that traditional NSAIDs, were not included in advertisements, and Defendants' sales force were directed to steer doctors' attention away from them. For example, in one letter to "Colleagues" found in the file of a member of Defendants' marketing team, Defendants' sales force is specifically instructed to steer doctors' attention away from potentially damaging scientific articles. The letter states in part,

> [a]lthough there has been media and physician interest in the Solomon data, we do not want to move our focus away from selling the benefits of Celebrex and Bextra.

---

Exhibit 5.

71

> Be diligent in reminding representatives the Solomon data are
> not to be proactively detailed. Instead, ask your representatives
> to be prepared to redirect the detail back to the Pfizer COX-2
> portfolio.

Such marketing methods are misleading, and were not approved by the FDA or the FDA

label, in that they fail to present a fair balance of the scientific data known regarding

Celebrex. Instead, they cause doctors and consumers to incorrectly believe that the

superiority and safety claims presented represent an accurate picture of the drug.

163.    Defendants similarly targeted Third-Party Payors with their false promotional

campaign of cardiovascular safety. The following excerpt of a direct mail letter to an

insurance provider falsely indicates that Celebrex has CV benefits.[15]

**CARDIOVASCULAR BENEFIT:**
It is well established that NSAIDs may cause edema and hypertension as well as disrupt the activity of some
antihypertensive medications including beta-blockers and angiotensin converting enzyme (ACE) inhibitors.

Emerging data on the use of COX-2 specific inhibitors in patients with cardiovascular disease and
hypertension have shown that celecoxib is a safe alternative to non-specific NSAIDs in this patient population.
To date, several head to head studies have shown significant increases in hypertension, edema, and
cardiovascular disease (CV) risk among Vioxx® (rofecoxib) users versus CELEBREX users. Some of the
study findings include:

The cited findings are studies performed by investigators with strong links and monetary ties to

the Defendants and thus, do not represent the CV profile of Celebrex with fair balance.

164.    The above examples of Defendants' massive marketing scheme are just a fraction

of the false and misleading statements that were directed to consumers, health professionals and

Third-Party Payors that misrepresented the CV profile of Celebrex. Such false

misrepresentations were material since End-Payors would either have purchased less expensive

traditional NSAIDs or nothing at all. Defendants knew that such misrepresentations were

material, because they were intended to contradict, mask and divert attention away from the

---

[15] The referenced excerpt appears at bates number Cele NDA 20-998 00021756 of Defendants' document attached
hereto as Exhibit 11.

Celebrex label listing both CV and GI adverse events, and the scientific data that over time became more and more negative for Celebrex.

165.    The Defendants' knowledge of CV risks was evidenced by a letter sent to the FDA on January 31, 2005:

> January 31, 2005
>
> Dr. Lester M. Crawford, Acting Commissioner
> Food and Drug Administration
> 5600 Fishers Lane
> Rockville, MD 20857
>
> Dear Dr. Crawford,
>
> Since filing our petition last week (January 24th) to immediately ban celecoxib (Celebrex) and valdecoxib (Bextra)[1] *we have discovered the results of an unpublished randomized placebo-controlled study of Pfizer*, finished more than four years ago, that showed a significantly increased rate (3.5-fold) of serious cardiovascular adverse events and *more than a doubling in the rate of cardiovascular deaths in people using celecoxib compared to those using a placebo in a study concerning Alzheimer's disease*. (Emphasis added.)
>
> * * *
>
> The combined rate of all serious cardiovascular adverse events in patients getting a placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6-fold increase in cardiovascular risk in those people taking celecoxib. (p=0.03)
>
> * * *
>
> Thus, there was a statistically significant increase in the composite of all serious cardiovascular events in patients getting Celebrex compared to patients getting a placebo.

166.    Defendants falsely promoted Celebrex as safe, without reference to the risks present in the FDA approved label, because reference to such risks would decrease sales. Since its "Black Box" warning concerning cardiovascular risks issued in August 2005, which constitutes only a partial disclosure, Celebrex sales have dropped by 48%.

**K.    Pfizer Temporarily Halts the Celebrex Promotional Scheme**

167.    On or about September 30, 2004, Merck withdrew its COX-2 inhibitor, Vioxx from the marketplace. In response, Pfizer issued a statement indicating it was "confident in the long term cardiovascular safety of Celebrex" and indicated that "since the introduction of COX-2 inhibitors, the rate of hospitalizations for gastrointestinal events associated with long term arthritis treatment has declined significantly."

168.    The foregoing statement was misleading in that it touted the cardiovascular safety of Celebrex and did not present the cardiovascular risks included in the Celebrex label. There was no statistically significant evidence to support the claim that Celebrex or other COX-2 inhibitors lead to a decrease in serious GI complications. In fact, data from a Canadian study shows that after COX-2 inhibitors became available in 2000 there was a 41% increase in NSAID use (accounted for entirely by COX-2 inhibitors) and a 10% increase in the hospitalization rate for GI bleeding – belying the claim above.[16]

169.    On December 17, 2004, Pfizer shocked consumers by disclosing a study that demonstrated an increased risk of cardiovascular disease (the 1999 Alzheimer's study referred to above). Pfizer then announced on December 20, 2004, that it would stop all television, radio, newspaper and magazine advertising. Pfizer did so because it was aware that its previous campaign was misleading.

170.    On February 1, 2005, Pfizer finally admitted it was aware of the 1999 Alzheimer's clinical trial finding that elderly patients using Celebrex were far more likely to suffer heart problems than patients taking a placebo. The study was never published and was not submitted to the FDA until 2001, four months after the FDA's review of Celebrex and Vioxx. As stated by David Graham, MD, MPH, of the FDA, in an editorial in the Journal of the American Medical

---

[16] Mamdani M., Jurlink D.N., Kopp A., et al., Gastrointestinal bleeding after the introduction of COX-2 inhibitors: ecological study, *British Medical Journal Online*:  http://bmj.bmjjournals.com/cgi/reprint/bmj.38068.716262.F7v1.

74

Association (JAMA) in September of 2006, "a Pfizer study of celecoxib in Alzheimer disease, which was completed in 2000 but not revealed until January 2005, showed an increase in cardiovascular risk with that drug. *See* Graham, D., Cox-2 Inhibitors, Other NSAIDs, and Cardiovascular Risk: The Seduction of Common Sense, JAMA, E 1-4, September 12, 2006. Indeed, in weighing the cardiovascular and gastrointestinal risk-benefit of Celebrex, purchasers, if they had been fully informed of the risks, could have reached the same conclusion as Dr. Graham, who questioned if "COX-2 inhibitors cost substantially more, confer substantially greater cardiovascular risk, and offer no unique and meaningful gastrointestinal tract benefit over generic naproxen plus proton pump inhibitor, is there any point to the continued use of these drugs?" *Id.* at E2.   The promotion of Celebrex as safer than Vioxx is a main reason why Celebrex has achieved greater commercial success than Vioxx.

**L.    Defendants' Continued Unlawful Marketing Campaign Caused Overpayments by End-Payors for Celebrex**

171.    As a result of Defendants' claims, Plaintiffs and members of the Class purchased and/or paid for Celebrex even though a monthly supply was much more expensive than other NSAIDs.

172.    To justify the disparity of Celebrex's pricing as compared to other NSAIDs and to ensure that physicians would prescribe and that End-Payors would purchase and pay for the drug, Defendants' misrepresented the safety and efficacy of Celebrex and omitted, concealed and suppressed the risks, dangers, and disadvantages of the drug through such misrepresentations, and engaged in promotion beyond that permitted by the FDA. Consequently, Celebrex captured a large market share of anti-inflammatory drugs prescribed for and used by patients. In 2004 alone, sales of Celebrex exceeded $1.2 billion, despite the significantly higher cost of Celebrex as compared to other pain relievers in the same family of drugs.

173.    Celebrex's deceptive and misleading marketing campaign resulted in overcharges to consumers and Third-Party Payors, such as Plaintiffs and the Class, for, in whole or in part, the costs of Celebrex. Millions of End-Payors, including consumers and Third-Party Payors, have already paid for, and/or purchased and consumed Celebrex at prices based on the proposed wholesale price, which was about one hundred times the cost of generic aspirin. These End-Payors did not get the benefit of the bargain that Defendants held out to them and as a result EndPayors paid more than they would have or should have because Celebrex was promoted and advertised as a premium drug with reduced side effects for the purpose of deceiving consumers and End-Payors about Celebrex's adverse cardiovascular and GI effects.

174.    But for Defendants' unlawful conduct Class Members would have not purchased Celebrex and/or would have purchased a cheaper alternative. But for Defendants' unlawful conduct, Celebrex would not have been on formularies and thus would not have been purchased. Defendants knew that if they were successful in getting Celebrex on the formularies of TPPs based on deception that it would be difficult to change prescribing patterns of doctors unless the drug was withdrawn.

### FRAUDULENT CONCEALMENT

175.    Plaintiff did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were falsely over promoting the safety and efficacy of Celebrex until April 7, 2005. Defendants conducted its unlawful activities in secret, concealed the nature of their unlawful conduct, and attempted to confine information concerning the adverse effects of Celebrex. Defendants attempted to withhold such information from Plaintiff, the medical community, regulators, and the public. Defendants fraudulently concealed its activities through various means and methods designed to avoid detection.

76

176.   Plaintiff could not have discovered Defendants' unlawful conduct at an earlier date through the exercise of reasonable diligence because Defendants actively and purposefully concealed their unlawful activities.

177.   Defendants engaged in a successful, illegal fraud on consumers, third-party payors and the general public, by which they deliberately and affirmatively misrepresented the risks, dangers, defects, and disadvantages of Celebrex, in at least the following respects:

a.   By falsely promoting the safety and efficacy of Celebrex to Plaintiff, the medical community, and the public in a manner that exceeded the scope of FDA approval;

b.   By omitting adverse event risks from its promotions of Celebrex to Plaintiff, the medical community, and the public in a manner that made its promotion not fairly balanced and inconsistent with the express label or the intent of the label;

c.   By agreements among senior Pfizer and Pharmacia officials in meetings and in communications not to discuss publicly, or otherwise reveal, the totality of the adverse effects caused by Celebrex, Defendants' concealment of those adverse effects, and the nature and substance of other acts and communications in furtherance of Defendants' illegal scheme; and

d.   By giving false and pretextual reasons for the existence of apparent adverse effects in studies of COX-2 drugs, including, for example, by claiming that naproxen's cardioprotective effect was responsible for a noted increase in cardiovascular events in the VIGOR study in Vioxx versus naproxen patients, when, in fact, Vioxx is another COX-2 inhibitor which was the cause of the reported increased incidence of cardiovascular effects.

178.   As a result of Defendants' fraudulent concealment, Plaintiff purchased and/or paid for Celebrex and could not reasonably have discovered Defendants' misconduct regarding

77

Celebrex until April 7, 2005.  Plaintiff therefore asserts the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff.

## COUNT I

### VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### K.S.A. § 50-626 – DECEPTIVE ACTS and PRACTICES

179.    Plaintiff hereby restates and re-alleges each and every allegation set forth in above, with the same force and effect as if herein repeated and set forth at length.

180.    The Purpose of The Kansas Consumer Protection Act, K.S.A. § 50-626, ("KCPA"), in part, is to protect consumers from suppliers who commit deceptive practices. K.S.A. § 50-623.  The Court must construe the KCPA liberally to promote its purpose. *Id.*

181.    Defendants supplied Celebrex, either by manufacture, distribution, or sales of the drug, even if only indirectly to Plaintiff, its' insured, and/or plan members.

182.    The KCPA states that no supplier shall engage in any deceptive act or practice in connection with a consumer transaction. K.S.A. § 50-626(a).

183.    Plaintiff's purchases and/or payments made with respect to Celebrex constitute consumer transactions within the meaning of the KCPA.

184.    Pursuant to the KCPA, deceptive acts and practices include, but are not limited to, the following:

> (1) Representations made knowingly or with reason to know that property or services are of a particular standard, quality, grade, style or model, if they are of another which differs materially from the representation.  K.S.A. § 50-626(b)(1)(D);
>
> (2) The willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact. K.S.A. § 50-626(b)(2)

78

> (3) The willful failure to state a material fact, or the willful
> concealment, suppression or omission of a material fact.
> K.S.A. § 50-626(b)(3).

185.    Defendants' marketing and sales activities with regard to Celebrex between on or about January, 1999, and the present, and at all times relevant herein, constituted deceptive acts and practices in violation of K.S.A. § 50-626(b).

186.    Defendants willfully omitted, suppressed, concealed, and/or failed to state material facts concerning the dangers and risks associated with the use of Celebrex, including but not limited to the risks of heart disease and cardiovascular injury. Further, Defendants willfully downplayed and/or understated the serious nature of the risks associated with Celebrex use in order to increase the sales of Celebrex.

187.    In their interaction with the FDA regarding the safety and efficacy of Celebrex, Defendants falsely and deceptively misrepresented or willfully omitted, suppressed, or concealed facts of such materiality that, had the FDA known of such facts, the drug would never have been approved and no physician would have been able to prescribe this drug to Plaintiff's plan members.

188.    Defendants knew or should have known (or would have known had appropriate testing been done) that use of Celebrex caused serious and potentially life-threatening side effects of cardiovascular injury, especially when used for extended periods of time.

189.    Defendants willfully engaged in calculated silence despite their knowledge to the growing public acceptance of misinformation and misrepresentations regarding both the safety and efficacy of the use of Celebrex, and did so because the prospect of significant future profits outweighed their concern regarding health and safety issues, all to the significant detriment of the public and Plaintiff.

79

190.   Many safe and less expensive indigestion agents were available to plan members treated with Celebrex.

191.   Defendants knowingly and intentionally touted the quality and standards of Celebrex that they knew were materially different from their representations of the drug, precluding Plaintiff from making informed decisions with respect to whether or not Celebrex should be a covered prescription medication.

192.   Defendants willfully downplayed the side effects and/or provided misinformation about adverse reactions and potential harms from Celebrex, and succeeded in persuading large segments of the relevant consumer market to request, and large segments of the medical community to prescribe Celebrex, despite both the lack of efficacy and the presence of significant dangers, as set forth herein.

193.   Defendants' success in persuading large segments of the relevant consumer market to request, and large segment of the medical community to prescribe Celebrex, caused Plaintiff to purchase and/or pay for Celebrex prescriptions on behalf of its plan members.

194.   Defendants had a clear post-manufacturing duty to warn, which arose when they knew, or with reasonable care should have known, that Celebrex was fatal or injurious.

195.   Defendants' actions set forth herein constitute willful concealment, suppression, or omission of material facts, made with the intent that others would rely upon such concealment, suppression or omission, in connection with the sale and marketing of Celebrex in violation of K.S.A. 50-626(b)(3).

196.   Additionally, Defendants' use of various media and detail men to advertise Celebrex involved willful oral and/or written representations of exaggeration, falsehood,

80

innuendo or ambiguity as to material facts and therefore constituted deceptive acts or practices as

defined by K.S.A. 50-626(b)(2)

197.    In paying for plan members' prescriptions for Celebrex, at all times relevant,

Plaintiff reasonably relied on Defendants' misleading marketing and advertising scheme.

198.    As a proximate result of the aforesaid violations of the KCPA, Plaintiff has

suffered ascertainable loss - economic loss that includes the purchase price of the drugs, and

Plaintiff is entitled to reasonable attorney fees, and statutory penalties for each individual

violation of the KCPA, for which Defendants, jointly and severally, are liable to Plaintiff for

their actual damages.

## COUNT II

## UNJUST ENRICHMENT

199.    Plaintiff hereby restates and re-alleges each and every allegation set forth above,

with the same force and effect as if herein repeated and set forth at length.

200.    Plaintiff, having purchased and/or made payments with respect to its insured and

plan members' prescriptions for Celebrex, have unjustly enriched Defendants.

201.    In order to maintain sales and profits, Defendants knowingly and intentionally

withheld material facts that would have informed Plaintiff and the medical community that

Celebrex's risks outweighed its benefits and that it should not have been a covered prescription

medication available to plan members.  The cumulative effect of Defendants' conduct directed at

Plaintiff, physicians, and other consumers was to artificially create demand for Celebrex at an

artificially inflated price.  Each aspect of Defendants' conduct combined to artificially create

sales of Celebrex.

81

202.    As a result, the sales of Celebrex provided ill-gotten gains for Defendants at the expense of Plaintiff, which Defendants cannot justify retaining.   Therefore, Defendants have unjustly benefited through the unlawful and/or wrongful collection of payments for Celebrex and continued to so benefit to the detriment of Plaintiff.

203.    As a direct and proximate result of the Defendants' acts, omissions and conduct as set forth above, Plaintiff is entitled to an award of a refund, restitution, and incidental economic losses, including the purchase price paid for the drug Celebrex.

**COUNT III**

**<u>IMPLIED WARRANTY</u>**

204.    Plaintiff hereby restates and realleges each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

205.    Defendants are merchants and are in the business of selling selective COX-2 inhibitor drugs such as Celebrex.

206.    Celebrex was not of merchantable quality and was not fit for its intended use, because it causes increased risk of serious cardiovascular and cerebrovascular adverse events, including heart attacks, strokes and other serious and harmful adverse health effects.

207.    Defendants breached their implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Kansas Stat. Ann. § 84-2-314, *et seq*.

208.    As a proximate cause of Defendants' breach of warranty, Plaintiff suffered ascertainable losses, injuries and damages as specified herein in an amount to be determined at trial.

209.    In marketing and selling Celebrex, Defendants impliedly warranted that Celebrex provided effective pain relief without the gastrointestinal side effects of traditional NSAIDs.

82

210.    In marketing and selling Celebrex, Defendants intentionally mislead purchasers to believe, and impliedly warranted, that Celebrex was cardiovascualarly safer than other NSAIDs and less dangerous to the skin than traditional NSAIDs.

211.    In reality, Celebrex failed to provide effective pain relief without the gastrointestinal side effects of traditional NSAIDs.  In fact, Celebrex caused or exacerbated cardiovascular and potentially fatal skin injury far more often than traditional NSAIDs, and even more often than other selective COX-2 inhibitor drugs.  Accordingly, for these and other reasons, Celebrex was not fit for the purposes for which it was sold and used, and it does not pass without objection in the trade.

212.    Defendants did not effectively disclaim or otherwise limit their implied warranty of merchantability with respect to Celebrex.  Therefore, Defendants breached the implied warranty of merchantability as to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.    Plaintiff be granted an award of damages in such amount to be determined at trial, with treble damages as provided by law;

B.    Plaintiff be granted an award of punitive damages in such amount to be determined at trial;

C.    Plaintiff recovers its costs of suit, including reasonable attorneys' fees and expenses as provided by law; and

D.    Plaintiff be granted an award of damages in such amount as necessary by law for each violation of the KCPA; and such other, further, and different relief as the nature of the case

83

may require or as may be determined to be just, equitable, and proper by this Court.

Respectfully submitted,

Thomas P. Cartmell          MO #45366
Thomas J. Preuss            MO #54923
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
(816) 701-1100
FAX (816) 531-2372


J. Scott Bertram            MO #23715
Benjamin A. Bertram         MO #56945
BERTRAM & GRAF, LLC
9229 Ward Parkway, Suite 225
Kansas City, MO  64114
(816) 523-2205
FAX (816) 523-8258


Michael L. Hodges           KS #09860
HODGES LAW FIRM
13420 Santa Fe Trail Dr.
Lenexa, KS  66215
(913) 888-7100
FAX (913) 888-7388


Mark Buck                   KS #09914
FAIRCHILD & BUCK, P.A.
832 Pennsylvania Street
P.O. Box 865
Lawrence, KS  66044
(785) 838-8950
FAX (785) 838-4990


Gerald B. Taylor
THE TAYLOR LAW FIRM
7208 Fairwoods Place
Montgomery, AL  36117
334-775-1025
FAX 334-775-1022


84

J. Paul Sizemore
GIRARDI & KEESE
1126 Wilshire Boulevard
Los Angeles, CA  90017
213-977-0211
FAX 213-481-1554

Steven R. Maher
MAHER, GUILEY AND MAHER, PA
631 West Morse Boulevard, Suite 200
Winter Park, FL  32789
407-839-0866
FAX 407-425-7958

**ATTORNEYS FOR PLAINTIFF**